## THE CABO VILLANO.

(District Court, E. D. New York. June 30, 1926.)

1. **Shipping ⚙︎117—Delivery of merchandise shipped on order bill of lading to one not holder of bill is wrongful delivery.**

Under both American and Spanish law, delivery by a ship of merchandise shipped on order bill of lading to one not holder of the bill is wrongful delivery.

2. **Carriers ⚙︎93.**

Bringing action on a sight draft with bill of lading attached is not ratification of wrongful delivery by the carrier.

3. **Election of remedies ⚙︎3(1)—Action against carrier for wrongful delivery held not barred by prior unsuccessful action against drawee on unaccepted sight draft with order bill of lading attached.**

An action on a sight draft, with order bill of lading attached, which was unsuccessful for lack of proof of legal acceptance of the draft,

is not inconsistent with, nor a bar to, a subsequent suit by the shipper, who still holds the bill of lading, against the carrier for wrongful delivery.

4. **Shipping ⚙︎140—In suit for wrongful delivery, provision of bill of lading limiting recovery for short delivery held not applicable.**

In a suit for failure to deliver or wrongful delivery, provision of bill of lading limiting amount recoverable for short delivery to invoice or declared value held not applicable.

5. **Shipping ⚙︎140—Provision in bill of lading limiting liability in case of loss held not applicable in suit for wrongful delivery.**

In suit for wrongful delivery of a shipment of automobiles, described as such in the bills of lading, a provision therein limiting liability in case of loss to $100 for each package held not applicable.

6. **Shipping ⚙︎132(3).**

Production of bills of lading by libelant in suit for wrongful delivery is presumptive evidence of its ownership.

7. **Principal and agent ⚙︎166(2)—Acceptance of remittance from agent held not ratification of any settlement made with debtor without authority or knowledge of principal.**

Receipt by a principal of a remittance from its agent, with whom it kept an account, held not a ratification of any settlement made with a debtor without its authority or knowledge.

8. **Admiralty ⚙︎66—Laches must be pleaded in proper time, and not set up by amendment, when libelant cannot meet it.**

Laches as a defense must be pleaded, and will not be permitted to be set up by amendment after it is too late for libelant to meet it.

9. **Shipping ⚙︎140—Clause in bill of lading attempting to exonerate carrier from liability for packages exceeding $100 in value held void.**

A provision of a bill of lading, drawn by the carrier, which attempts to exonerate it from liability for goods exceeding in value $100 per package, is void.

10. **Shipping ⚙︎131—Measure of damages for nondelivery of cargo stated.**

The measure of damages for nondelivery of goods is the market price which the shipper would have to pay to replace the articles in port of delivery at the time delivery should have been made, customs duties not considered, less landing charges and freight, if not paid.

In Admiralty. Suit by the Moline Plow Company, Inc., against the steamship Cabo Villano; Ybarra & Co., claimant. Decree for libelant.

Richards & Affeld, of New York City (Joseph W. Zeller, of New York City, of counsel), for libelant.

Barnes, McKenna & Halstead, of New York City (Bernard C. McKenna and James M. Snee, both of New York City, of counsel), for claimant.

CAMPBELL, District Judge. This suit is brought by the libelant, Moline Plow Company, Inc., a Virginia corporation, the successor in interest of the Moline Plow Company, an Illinois corporation, against the steamship Cabo Villano and her owners, Ybarra & Co., for failure to make delivery of three Stephens automobiles shipped by the said Illinois corporation, Moline Plow Company, on or about October 8, 1920, from the port of New York to the port of Seville, Spain, upon two duly issued bills of lading consigned to order, which bills of lading were delivered to the shipper. The automobiles were loaded on the Cabo Villano, and on arrival at Seville were discharged in the usual manner to the Spanish government. On all the evidence I find the facts to be as follows:

On the order which Juan de Haro, agent for the steamship Cabo Villano, gave to Juan Revilla, on December 11, 1920, the automobiles were promptly delivered to the said Juan Revilla, a consular agent, on December 13, 1920, who claimed the right to receive delivery of these automobiles on account of Lopez Belmonte, Limited. Delivery of the automobiles was made without presentation of the bills of lading, and said bills of lading were not surrendered at any later time to Ybarra & Co., owners of the steamship Cabo Villano, or any of its agents.

Delivery was made to Juan Revilla because he was a reliable and well-known person, because Ildefonso Rios seemed to be the importer and was a man of recognized moral and financial standing, and because Revilla exhibited the invoices and a letter of guaranty which remained in his possession. The automobiles were then forwarded by Juan Revilla to some party or parties unknown to the libelant. Lopez Belmonte, Limited, claimed in the action brought in the Spanish court of first instance that it never did accept the automobiles.

Moline Plow Company, an Illinois corporation, of Moline, Ill., was a manufacturer of agricultural machinery and automobiles, and had as its sales and jobbing agents a Paris partnership of Stephens, Allen & Co., who were permitted to do business at Paris under the trade name of Moline Plow Company, but having their own accounts with their European customers. Pablo Kapferer was the manager of Stephens, Allen & Co. Prior to the transaction with reference to the automobiles in question, Lopez Belmonte, Limited, had dealt largely with Stephens, Allen & Co., and owed that copartnership a considerable sum.

The relations between Stephens, Allen &

Co. and Lopez Belmonte, Limited, had become strained, and the Moline Plow Company notified Lopez Belmonte, Limited, by letter of August 16, 1920, that the Paris partnership of Stephens, Allen & Co. was charged with the duty of collecting its own accounts abroad, but that thereafter the foreign trade department of the Moline Plow Company would conduct all of its dealings with Lopez Belmonte, Limited, without further negotiations through Stephens, Allen & Co.

Lopez Belmonte, Limited, ordered the automobiles in question directly from the Moline Plow Company, at Moline, Ill., and because business conditions abroad were bad and Lopez Belmonte, Limited, was indebted to Stephens, Allen & Co. in a large sum, the Moline Plow Company shipped the three automobiles to Lopez Belmonte, Limited, on a sight draft with bills of lading attached. The sight draft with bills of lading attached were delivered to the National City Bank in New York, together with the usual letter of instructions requesting it to collect the draft.

The National City Bank transmitted the sight draft for $7,356.31, with charges, with bills of lading attached, to its agent in Spain, Banco Hispano Americano, for collection, by whom they were received on the 6th day of November, 1920. On November 12, 1920, and officially by a notary on November 15, 1920, the Banco Hispano Americano presented the sight draft, which, with charges, amounted to $7,363.66, to Lopez Belmonte, Limited, who refused to pay it because of a dispute over the rate of exchange.

Moline Plow Company gave the National City Bank instructions to force the collection of the draft, and on instructions from the National City Bank its correspondent, the Banco Hispano Americano, on July 26, 1921, commenced an executive action against Lopez Belmonte, Limited, on the draft, on the theory that there had been an implied acceptance. In that action delivery of the automobiles was not alleged or proved by the Banco Hispano Americano; the only question considered being whether the draft had or had not been accepted.

Judgment was rendered in the lower court in favor of Banco Hispano Americano, on the ground of an implied acceptance of the draft, on the 12th day of July, 1922. An appeal was then taken to a higher court by Lopez Belmonte, Limited, which court, on the 16th day of March, 1923, set aside the judgment of the lower court on the ground that no express acceptance had been made, and

on March 31, 1923, the Moline Plow Company was notified thereof.

The Moline Plow Company did not have any knowledge or information before the action for the recovery of the amount of the said draft was commenced in Spain that said automobiles, covered by said bills of lading, had been delivered by the Cabo Villano or her owners or their agents to any one, and in fact had no such information until August 23, 1922, when J. C. Smith, the New York representative of the Moline Plow Company, made inquiry of Briones & Co., agents at New York for the steamship Cabo Villano, whether the merchandise covered by the bills of lading had been delivered, and received a reply by letter, dated August 23, 1922, which stated that the merchandise had been delivered without presentation of a bill of lading, and further stated that "this proceeding is employed here when the person deserves entire confidence."

Shortly after the Moline Plow Company was notified of the judgment of the higher court in Spain, demands were made on Briones & Co. for payment of the amount of the merchandise, which had apparently been delivered over by Ybarra & Co. without surrender of the bills of lading. On November 22, 1923, the Banco Hispano Americano, at the direction of the libelant herein, exhibited the original bills of lading to Ybarra & Co., the agents of the steamship Cabo Villano, at Seville, and requested delivery of the automobiles, and were told by Ybarra & Co. that the automobiles had been delivered to Juan Revilla, who had shown the invoices for the automobiles at that time and exhibited "a letter of guaranty which remained in his possession."

The sight draft and bills of lading were thereafter returned through the National City Bank to the proctors for libelant for the purpose of bringing this action. On March 1, 1922, Pablo Kapferer, the manager of Stephens, Allen & Co., of Paris, made a settlement with Lopez Belmonte, Limited, of the account due to Stephens, Allen & Co. for $20,000, the proceeds of which settlement was transmitted by Pablo Kapferer to Moline Plow Company, at Moline, Ill., and credited on the books to the account of Stephens, Allen & Co.

[1] Under the American law the ship's obligation was to deliver the automobiles to the holder of the to order bills of lading, and a delivery to one who was not a holder or owner thereof was a violation of the ship's obligation. This was likewise true under the Spanish law. (See deposition in the case at bar of a Spanish lawyer, Adolfo Lama Perez, in which is found the following quoted Spanish decision):

"The first and principal obligation consists in delivering the merchandise to the person who presents the bill of lading made out or indorsed in his favor, or in depositing the merchandise in accordance with articles 369, 625, and 711, of the Code of Commerce, without being able of his own accord to change the destination of the merchandise."

And it is also true under the English law, which on this point, is the same as the American law. Scrutton on Charter Parties and Bills of Lading (12th Ed.) by Porter & McNair, art. 125, p. 335).

In The Stettin (1889), 14 Probate Div. 142, the English court held that on this point the German law did not essentially differ from the English law.

The claimant seeks to relieve itself from this obligation on several grounds, which are pleaded as special defenses in its answer. That the automobiles on arrival at Seville were discharged in the usual manner to the Spanish government is admitted, but I do not see how that relieves the vessel or the claimants, because the Spanish government did not make delivery, except upon the order of the agent of the claimant respondent, and such order was given by such agent to one Juan Revilla, a consular agent, because he was a reliable and well-known person.

No proof whatever was offered to show that the agent of the claimant respondent was compelled by the requirements, laws, customs, and regulations of the port of Seville and of the kingdom of Spain to make the order to deliver the said automobiles to Juan Revilla; on the contrary, the order seems to have been voluntarily made for the reasons shown. Undoubtedly, under the said requirements, laws, customs, and regulations, an order from the agents of the claimant respondent was required before delivery would be made; but it rested with the agent of the claimant respondent to determine to whom it would issue the order.

There is no evidence that the automobiles ever came into the possession of Lopez Belmonte, Limited, however great may be the suspicion that they did, and in the plea of Lopez Belmonte, Limited, in the executive action, in which there was set forth much that was not relevant in that form of action, it would appear that Lopez Belmonte, Limited, denied having accepted the automobiles.

It is admitted that the Banco Hispano Americano, the correspondent in Spain of the National City Bank of New York, to

whom libelant had delivered the sight draft with bills of lading attached for collection, commenced an executive action against Lopez Belmonte, Limited, for the collection of the draft in the court of first instance at Albacete, Spain, on July 26, 1921. It is not admitted, but clearly appears from the evidence, that the Moline Plow Company did not know of the delivery of said automobiles by the vessel or claimant respondent before the commencement of the said action, nor in fact until the 23d day of August, 1923, after judgment had been rendered in the court of first instance in the said suit against Lopez Belmonte, Limited, on said draft, and it had appealed, which appeal was then pending.

Delivery of the automobiles was not alleged, nor was it necessary to alleged delivery of them, in the action brought in Spain, because delivery was not to be made until the sight draft was paid, and the Moline Plow Company had a right to require payment of the draft before delivering the bills of lading to Lopez Belmonte, Limited, and the delivery of the automobiles by the vessel or claimant respondent without receiving the bills of lading was wrongful.

[2] The bringing of the action by the Banco Hispano Americano against Lopez Belmonte, Limited, did not operate as a ratification of the conduct of the vessel or claimant respondent in making the wrongful delivery. Central of Georgia Railway Co. v. Dothan National Bank, 206 Ala. 602, 91 So. 351; McSwegan et al. v. Pennsylvania R. Co., 7 App. Div. 301, 40 N. Y. S. 51, and 13 App. Div. 625, 43 N. Y. S. 1159. The executive action brought in Spain did not proceed upon the theory that the automobiles had been delivered, but solely upon the theory that there had been an implied acceptance of the sight draft, and this was the question litigated.

The Moline Plow Company was entitled to retain the bills of lading until the sight draft was paid, and the vessel or claimant respondent had no right to deliver the automobiles until the bills of lading were delivered to them. The lower court held that there had been an implied acceptance of the sight draft, and rendered judgment thereon against Lopez Belmonte, Limited. An appeal to the higher court found that there could be no implied acceptance under the Spanish law, and, because no acceptance such as their law required had been shown, reversed the judgment of the lower court and vacated the same.

[3] The libelant, being the owner and holder of the bills of lading, caused them to be presented to the claimant respondent and demanded delivery of the automobiles, and on their failure to make such delivery brought the action at bar. These actions do not proceed upon opposite and irreconcilable claims of right, but are thoroughly consistent, and the bringing of the action in Spain against Lopez Belmonte, Limited, is not a waiver of the wrongful delivery, nor is it inconsistent with this action, in which recovery is sought against the vessel and claimant respondent for breach of the contract to deliver to the holder of the bills of lading. Henry v. Herrington, 193 N. Y. 218, 86 N. E. 29, 20 L. R. A. (N. S.) 249; Bank of United States v. National City Bank of N. Y., 123 Misc. Rep. 801, at page 805, 206 N. Y. S. 428.

On refusal of Lopez Belmonte, Limited, to accept the draft, the Moline Plow Company had no remedy thereon. It had in fact but one remedy, the one they are now pursuing in the action at bar, and therefore there was no choice between two remedies, and libelant is not barred recourse to the remedy which it had. Schenck v. State Line Telephone Co., 238 N. Y. 308, 144 N. E. 592, 35 A. L. R. 1149.

[4] There is no claim for short delivery in the case at bar, but the claim is for a breach of the vessel's obligation to deliver to the holder of the bills of lading, because a wrongful delivery had already been made, and therefore I fail to see how the vessel or claimant respondent can claim the benefit of paragraph or condition 9 of the bill of lading, which reads as follows:

"9.—Also that, in the event of claims for short delivery when the ship reaches her destination, the price shall be the invoice or declared value, whichever is least; such claims are void unless made at port of discharge."

[5] The contention made on behalf of the vessel and claimant respondent that the libelant's recovery must be limited to $100 for each package, or $300 in all, under the provisions of paragraph or condition 1 of the bill of exchange, does not seem to apply, because the character of the merchandise shipped (automobiles) is plainly stated in the bill of lading.

[6] The fact that there appears an indorsement in blank on one or more parts of the bills of lading, does not prove that libelant is not the lawful and true owner, and there is nothing in the evidence in this case to show that any claim was made under said bills of lading by any one other than the Moline Plow Company, or the Banco Hispano Americano, who through the National City

Bank of New York was representing the interest of the Moline Plow Company. The fact that the libelant, to whose predecessor in interest the bills of lading were issued, had the same in its possession and presented them on the trial in support of its claim, is presumptive evidence of its ownership, which presumption has not been rebutted.

There is no evidence in this case that satisfies me that the Moline Plow Company of Illinois, or the libelant, or both of them, ever assigned and transferred to Pedro Gomez Molina, acting in the name and as the representative of Sociedad Anonima Gimenez y Dalmau, all debts and claims of indebtedness, including its right, title, and interest therein, for a valuable consideration, and that that society was at the time of the commencement of the action at bar, and still is, the owner thereof.

There is also no evidence in this case that satisfies me that the Moline Plow Company of Illinois and Lopez Belmonte, Limited, ever entered into any agreement of settlement which covered the three automobiles in question, or that the sum of $20,000, paid by or at the request of Lopez Belmonte, Limited, to Pablo Kapferer in settlement of certain claims against Lopez Belmonte, Limited, included the automobiles in question.

The evidence clearly shows that Lopez Belmonte, Limited, were indebted in a sum exceeding $92,000 for merchandise manufactured by the Moline Plow Company, of Illinois, which had been purchased through the partnership of Stephens, Allen & Co., and Pablo Kapferer being the manager of said firm, which was permitted to use the tradename "Moline Plow Company."

The said sum did not include the three automobiles in question, which had been purchased direct by Lopez Belmonte, Limited, from Moline Plow Company, of Illinois, and said Lopez Belmonte, Limited, knew that the Paris partnership of Stephens, Allen & Co. had no connection with the sale of said automobiles, or right to compromise with reference thereto, and Pablo Kapferer had also been instructed that neither he nor Stephens, Allen & Co. had any right to make agreements as to said automobiles.

The sum of more than $92,000, which Lopez Belmonte, Limited, owed to Stephens, Allen & Co. for the merchandise manufactured by Moline Plow Company, of Illinois, other than the three automobiles, was charged on the books of said Moline Plow Company to said Stephens, Allen & Co., and when Lopez Belmonte, Limited, made its settlement with Pablo Kapferer for $20,000, that sum was sent to the Moline Plow Company which credited it to the account of Stephens, Allen & Co., whereas the three automobiles in question were charged directly to Lopez Belmonte, Limited, and not to Stephens, Allen & Co., and nothing has been paid on account thereof.

[7] The acceptance by Moline Plow Company of the $20,000 sent to it by Stephens, Allen & Co., and the crediting it to their account, did not constitute a ratification of anything which might have been done in excess of their authority by Stephens, Allen & Co., in settling with Lopez Belmonte, Limited, the account due to them. Dudley v. Perkins, 235 N. Y. 448, 139 N. E. 570; Iroquois Mfg. Co. v. Davis, 122 Misc. Rep. 273, 203 N. Y. S. 607; Wheeler v. Northwestern Sleigh Co. (C. C.) 39 F. 347.

It clearly appears to me that both Lopez Belmonte, Limited and Pablo Kapferer well knew that said Kapferer had no power or authority to make any agreement whatever with reference to the payment for said automobiles, but that as to them all dealings had to be with the Moline Plow Company direct. The said settlement did not constitute an accord and satisfaction with reference to the said automobiles or the claim for payment therefor.

In addition to all the other evidence, it appears that, although the settlement was made about March 1, 1922, before the action in the court of first instance was decided, no claim was made by Lopez Belmonte, Limited, until after the reversal of the judgment of the court of first instance by the higher court on March 16, 1923, and then the information that it would make such claim was only obtained indirectly, from which it appears to me, from the pleading in the case, that if Lopez Belmonte, Limited, had at that time had any belief that it had compromised the claim for such automobiles in such settlement, it would have made such claim known.

The alleged copy of the agreement of settlement offered by the claimant respondent, marked Exhibit K, which was admitted and decision reserved on a motion to strike out, was not proved to have been executed, and under the most liberal rule as to secondary evidence does not seem to me to be admissible. The motion to strike out is granted over the objection of claimant respondent.

[8] Claimant respondent strongly contends that the libelant should be barred as guilty of laches and argues this point at some length, but the answer to this argument seems to be simple. Laches as a defense must be alleged, and there is no allegation anywhere in the

voluminous answer and supplemental answer in this suit of the defense of laches.

The question of the issuance of commissions and as to the interrogatories to be attached has been before this court on several occasions, and, if there was any laches on the part of the libelant, it must have been known to the claimant respondent long before the trial, and the libelant should have been apprised of such defense and given an opportunity to meet it, which was not done; and while I am familiar with the liberality displayed in admiralty in permitting amendments, under all the circumstances this application to amend comes too late, because the action was brought well within the time provided by the state statute of limitations, which, while not binding on this court, is generally followed, unless by the delay in bringing the action the respondent is injured, and in this case the principal reason assigned is inability to obtain certain evidence. But inasmuch as this action was commenced on January 7, 1924, and was not tried until January, 1926, it would seem that all the evidence required could have been obtained if the claimant respondent had moved expeditiously.

The motion for leave to amend is therefore denied.

[9] This leaves for consideration only the question of damages. The claimant respondent contends that they are limited to $100 for each automobile, and in support of that contention points to the bills of lading, so much of which as is necessary for consideration reads as follows:

"It is also mutually agreed that this shipment is subject to all the terms and provisions of and all the exemptions from liability contained in the act of Congress of the United States, approved on the 13th day of February 1893 (and entitled an Act to Navigation of Vessels, etc.)"

"1. It is also mutually agreed that the carrier shall not be liable for articles comprised in section 4281 of the Revised Statutes of the United States, nor for any package exceeding the sum of $100 in value, unless notice of true character and value thereof is given and same is entered in the bill of lading."

The bill of lading was not drawn by the shipper, but by the carrier, and is ambiguous, and is to be construed as a statement that the carrier shall not be liable to any amount for goods exceeding $100 per package. This is an attempt on the part of the carrier to exonerate itself from all responsibility for goods exceeding the value of $100

per package and is invalid. Calderon v. Atlas Steamship Co., 170 U. S. 272, 18 S. Ct. 588, 42 L. Ed. 1033; Lines v. Atlantic Transport Co., 223 F. 624, 139 C. C. A. 170.

The claimant respondent attempts to distinguish the case at bar from Calderon v. Atlas Steamship Co., supra, by calling attention to the fact that the bill of lading on its face provides that the shipment is subject to the Act of February 13, 1893; but that attempt, in my opinion, is a failure because, in the bill of lading condemned in Calderon v. Atlas Steamship Co., supra, it is provided in article 14: "This agreement is made with reference to and subject to the provisions of U. S. Carriers' Act, approved February 13, 1893."

The cases cited by the claimant respondent (Hart v. Pennsylvania R. Co., 112 U. S. 331, 5 S. Ct. 151, 28 L. Ed. 717; Reid v. American Express Co., 241 U. S. 544, 36 S. Ct. 712, 60 L. Ed. 1156; Stevens v. Cunard S. S. Co. (C. C. A.) 271 F. 306) are not in point, because there is not by the provisions of article 1 of the bill of lading in the case at bar, supra, an agreed valuation of the character sustained in the cases cited, but an attempt to exonerate the carrier from liability for any package of a value exceeding $100.

[10] The true measure of damages, the limitation of liability being eliminated, is the market price which libelant would have to pay in the port of delivery for other merchandise to replace the goods sent to its customer (Downing v. Outerbridge, 79 F. 931), less the landing charges at the time and place the shipment should have arrived (The St. Johns N. F. [C. C. A.] 280 F. 553, affirmed 263 U. S. 119, 44 S. Ct. 30, 68 L. Ed. 201); but customs duties are not to be included or allowed for in estimating the market value of the goods (United States Willow Furniture Co. v. La Compagnie Générale Transatlantique [C. C. A.] 271 F. 184; Eroe, The, Fed. Cas. No. 4521, 9 Ben. 191). The automobiles in question could not be bought or replaced at wholesale prices at Seville, Spain, in December, 1920.

The testimony of M. Arteman, Calle Sierpes 80, Seville, Spain, is much more convincing than the testimony of Joaquin Mauri, of Amador de los Rios No. 12, Seville, Spain, another witness called as an expert; but both were called by libelant, and, while I give more weight to the testimony of the witness Arteman, his valuation of 90,000 pesetas is, in my opinion, too high, and I therefore find that the value of said automobiles, at that time and place, was 75,000 pe-

setas, which, converted into dollars, at the rate of exchange existing on December 11, 1920, of 13 cents per peseta, makes the value in dollars $9,750.

The ocean freight was paid, and there is no evidence of any landing charges having been paid by the ship.

The motion to dismiss the libel is denied. A decree may be entered in favor of the libelant in this action for $9,750, with interest thereon from December 11, 1920, and with costs.