ALLIED CHEMICAL INTERNATIONAL CORP., Plaintiff-Appellee,

v.

COMPANHIA DE NAVEGACAO LLOYD BRASILEIRO, Defendant-Appellant.

No. 1125, Docket 85-7103.

United States Court of Appeals, Second Circuit.

Argued May 8, 1985.

Decided Oct. 15, 1985.

Richard A. Hagen, New York City (Francis R. Matera, Crowell, Rouse, Varian, Hagen & Matera, New York City, of counsel), for defendant-appellant.

Irving Ronald Storch, Carle Place, N.Y., for plaintiff-appellee.

Before MESKILL, KEARSE and WINTER, Circuit Judges.

MESKILL, Circuit Judge:

Companhia de Navegacao Lloyd Brasileiro (Lloyd), an ocean carrier, appeals from a judgment of the United States District Court for the Southern District of New York, Owen, J., finding Lloyd liable to Allied Chemical International Corporation (Allied), a shipper, for the misdelivery of goods to the consignee, Banylsa Tecelagem do Brasil S.A. (Banylsa). The carrier caused the goods to be delivered without requiring Banylsa to produce the original order bill of lading. Lloyd also challenges the district court's refusal to interpret the Carriage of Goods by Sea Act (COGSA) package limitation, 46 U.S.C. § 1304(5) (Supp. I 1983), which was incorporated into the bill of lading, to reduce Allied's recovery. The court awarded damages equal to the value of the cargo in United States dollars minus an amount that Allied had

already recovered from Banylsa plus interest.

We affirm the judgment of the district court.

## BACKGROUND

This case was decided without a trial. The parties submitted to the district court two stipulations of fact; the deposition of Pedro Calmon Filho, an expert on Brazilian law; memoranda, one of which included an appendix; and separate proposed findings of fact and conclusions of law. Allied alleged federal jurisdiction on the basis of admiralty or, alternatively, diversity of citizenship. The pertinent, undisputed facts follow.

In September 1980, Allied, an exporter of chemical products, received from Banylsa an order for a quantity of caprolactam, a crystalline cyclic amide used in the manufacture of nylon. The sale was to be in two lots of 6,000 bags on terms of sight drafts against documents through Banco Bamerindus do Brasil S.A. of Sao Paulo, Brazil (Brazilian bank). The sight drafts were in the amount of the per lot invoice price, $266,756.92 C & F Salvador, Brazil.

In October 1980, Allied delivered to Lloyd at the Port of Norfolk, Virginia two lots of 150 double faced pallets, each lot said to contain 6,000 bags of caprolactam to be shipped to the Port of Salvador, Brazil. The cargo was loaded onto Lloyd's vessel ITAPURA. Lloyd issued clean order bills of lading that described the cargo, listed Allied as the shipper and showed that the goods were consigned to the order of Banylsa. Banylsa was also listed as the notify party. Allied, through its bank, forwarded the shipping documents—including the sight drafts, the original bills of lading and the original commercial invoices—to the Brazilian bank for handling and collection. Allied specifically instructed the Brazilian bank to deliver the documents only against payment of the sight drafts.

On or about November 12, 1980, Lloyd's vessel arrived at the Port of Salvador. In accordance with local custom and usage, the carrier unloaded the caprolactam at a warehouse under the control of the Administration of the Port of Salvador (the port authority), an agency of the Brazilian government. The caprolactam was undamaged.

Banylsa made payment on only one of the two sight drafts and therefore received from the Brazilian bank only one bill of lading. It is the bill of lading not received and the lot to which it related that are the subject of this dispute. Hereinafter, when we refer to the cargo or to the bill of lading, we refer solely to the misdelivered goods and the bill of lading that covered them.

On November 17, 1980, Banylsa through its agent delivered to Lloyd's agent in Salvador a letter explaining simply that the original bill of lading had not been received and requesting Lloyd to issue in accordance with Brazilian import regulations a "carta declaratoria," a letter declaring that the freight had been paid at the port of origin and that the Merchant Marine Renewal Tax had been paid in Salvador.[1] That same day, Lloyd's agent issued the requested document.[2] The parties do not dispute that

---

**1.** The body of the letter sent by Banylsa's agent to Lloyd's agent provided as follows:

With reference to Bill of Lading No. 2—Norfolk/Salvador of steamship "Itapura" V. 80148.2 arrived at this port on November 11, 1980, due to the fact that the Original Bill of Lading up to to [sic] the present date has not been received and in compliance with our client (Banylsa Tecelagem do Brasil S.A.)'s request, the said Bill of Lading being consigned to the order of the latter, for the purpose of [customs clearance regulations], we beg hereby your being kind enough to supply a "carta declaratoria" that the freight has been

paid at the port of origin and that the T.R. M.M. payment was made here.
J.App. at 27.

**2.** The body of the carta declaratoria issued by Lloyd's agent stated as follows:

Vessel "ITAPURA" arrived on 11/11/1980—150 pallets, marked "BANYLSA–ARATU–VIA SALVADOR BA 473 FIB 8766 WEIGHT 158,876 kgs. containing 6,000 bags of caprolactam consigned to Banylsa Tecelagem do Brasil S.A."
For the purpose of [customs clearance regulations], we state that we do not object to the

to obtain the release of goods from the port authority, a party would have to produce either the original bill of lading or a carta declaratoria from the carrier. Thus, by virtue of the carta declaratoria, Banylsa was able to obtain possession of the caprolactam although it had not paid for the goods and it was not in possession of the bill of lading.

Allied first became aware that the sight draft had not been paid in January 1981. It was not until several weeks later, however, when Banylsa complained about the quality of the caprolactam, that Allied discovered that Banylsa had, notwithstanding nonpayment, obtained possession of the caprolactam. After an investigation that included an on-site inspection of the goods at Banylsa's facility, Allied rejected Banylsa's quality complaint.

In early April 1981, Banylsa filed a voluntary receivership proceeding in the Civil Court of the District of Salvador, Brazil. On May 8, 1981, Allied made a demand on Lloyd for losses incurred as a result of the carrier's failure to request proper documentation before authorizing the release of the caprolactam. J.App. at 160. The demand letter stated that Allied had been advised by Lloyd that the goods were released on Banylsa's promise to deliver the original bill of lading within 90 days. *Id.* Negotiations between the shipper and the carrier proved unavailing and Allied filed this suit in September 1981.

In May 1981, Allied filed a claim against Banylsa in the receivership proceeding. In September 1983, Banylsa deposited with the Salvador court 20,414,907 cruzeiros to pay Allied's share of the receivership distribution. The amount was equal to Allied's claim in United States dollars at the exchange rate of 76.53 cruzeiros to the dollar, the rate in effect when Banylsa filed its petition. Allied argued that it was entitled to payment at the rate in effect on the date of Banylsa's deposit, 671 cruzeiros to the dollar. On advice of counsel, Allied abandoned its appeal and accepted a sum in cruzeiros equal to less than $40,000 as of September 1983.

In its complaint against Lloyd, Allied charged that the ocean carrier had breached its contract of carriage with Allied. It also claimed that Lloyd was liable for conversion of the cargo because Lloyd authorized the delivery of the cargo to a party not entitled to possession. The district judge decided in Allied's favor and adopted Allied's proposed findings of fact and conclusions of law virtually verbatim. The findings and conclusions cited no cases and contained not a single reference to the brief but adequate record.

On appeal, Lloyd preliminarily argues that because the district court decided this case on submission and because the court simply adopted the prevailing party's proposed findings verbatim, our review should not be limited by the clearly erroneous standard but should be *de novo.* On the issue of liability, Lloyd raises four challenges. First, it claims that it fully discharged its responsibility under the contract of carriage when it delivered the cargo as dictated by local custom and usage to the government controlled port authority. Second, Lloyd claims that it cannot be liable for conversion either because that would be contrary to Brazilian law or because the rights and liabilities under COGSA, 46 U.S.C. § 1300 *et seq.* (Supp. I 1983), are exclusive. Third and fourth, Lloyd raises related arguments, payment and waiver, based on Allied's claim and partial recovery against Banylsa in the receivership proceeding. Finally, Lloyd contends that even if it is liable, the COGSA package limitation, incorporated into the bill of lading, should reduce Allied's recovery to $500 per pallet or $75,000. For the reasons that follow, we reject Lloyd's arguments.

## DISCUSSION

A. *The Scope of Review*

The Supreme Court recently and unequivocally rejected the standard of review

---

customs clearance of the cargo referred to above, since the freight and the Merchant Marine Renewal Tax have already been paid.

J.App. at 28.

that Lloyd urges us to employ. In *Anderson v. City of Bessemer City*, —— U.S. ——, ——, 105 S.Ct. 1504, 1508, 84 L.Ed.2d 518 (1985), the Court reversed a Fourth Circuit decision on the ground that the appeals court "misapprehended and misapplied the clearly-erroneous standard." The circuit court had reasoned that an essentially *de novo* review of the record was justified because the district court had adopted, albeit with some variation, the prevailing party's proposed findings of facts. The Supreme Court adamantly disagreed. Emphasizing that "review of factual findings under the clearly-erroneous standard—with its deference to the trier of fact—is the rule, not the exception," *id.* at ——, 105 S.Ct. at 1512, the Court explained that neither findings based on documentary evidence and thus largely devoid of credibility considerations, *id.*, nor findings adopted verbatim from a party's proposals may be subjected to a more stringent standard of review. *Id.* at ——, 105 S.Ct. at 1509.

■ We certainly do not wish to in any way condone the verbatim adoption of proposed findings of fact. While recognizing the time pressures on district court judges, we have expressed our displeasure with this procedure in the past. *E.g., International Controls Corp. v. Vesco*, 490 F.2d 1334, 1341 n. 6 (2d Cir.), *cert. denied*, 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974). In this we are not alone. *E.g., Bessemer City*, —— U.S. at ——, 105 S.Ct. at 1509; *United States v. Marine Bancorporation*, 418 U.S. 602, 615 n. 13, 94 S.Ct. 2856, 2866 n. 13, 41 L.Ed.2d 978 (1974); *United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 656–57, 84 S.Ct. 1044, 1047–48, 12 L.Ed.2d 12 (1964). Nonetheless, we are bound to uphold the findings of the court below unless, on the basis of the entire record, we are convinced that they are clearly erroneous. We are not persuaded that the findings below fall short of this familiar benchmark. We therefore leave them undisturbed.

## B. *Jurisdiction and Governing Law*

■ This suit involves claims by a shipper against an ocean carrier arising from an alleged breach of a contract of carriage. Thus it lies within our admiralty jurisdiction. *Leather's Best, Inc. v. S.S. Mormaclynx*, 451 F.2d 800, 807 (2d Cir.1971); *David Crystal, Inc. v. Cunard Steam–Ship Co.*, 339 F.2d 295, 298 (2d Cir.1964), *cert. denied*, 380 U.S. 976, 85 S.Ct. 1339, 14 L.Ed.2d 271 (1965); *see* 28 U.S.C. § 1333(1) (1982). Consequently, this action is governed by federal maritime law.

## C. *Liability*

■ The liability question in this case inextricably involves the critical importance of the documentary transaction in overseas trade. *See generally* G. Gilmore & C. Black, The Law of Admiralty 110–12 (2d ed. 1975). The documentary sale enables the distant seller to protect himself from an insolvent or fraudulent foreign buyer by ensuring that the buyer ordinarily cannot take possession of the goods until he has paid for them. It accomplishes this rather simply. The seller tenders shipping documents, including a negotiable bill of lading, rather than goods to the buyer. By paying for the documents, the buyer gets possession of the original bill of lading. Possession of the bill entitles him to possession of the goods; it represents the goods and conveys title to them. Most likely, the bill will be an order bill of lading, made to the order of or endorsed to the buyer. *See id.* at 96–97. Absent a valid agreement to the contrary, the carrier, the issuer of the bill of lading, is responsible for releasing the cargo only to the party who presents the original bill of lading. "Delivery to the consignee named in the bill of lading does not suffice to discharge the [carrier] where the consignee does not hold the bill of lading." 2 T.G. Carver, Carriage by Sea ¶ 1593 (R. Colinvaux 13th ed. 1982). If the carrier delivers the goods to one other than the authorized holder of the bill of lading, the carrier is liable for misdelivery. *David Crystal*, 339 F.2d at 300; *Morse Electro Products Corp. v. S.S. Great Peace*, 437 F.Supp. 474, 482 (D.N.J. 1977); *The Cabo Villano*, 14 F.2d 978 (E.D.

N.Y.1926), *modified as to damages*, 18 F.2d 220 (2d Cir.1927). The ocean carrier's liability arises from rights of property, 1 T.G. Carver, *supra*, at ¶ 120, and "[d]elivery to a person not entitled to the goods without production of the bill of lading is prima facie a conversion of the goods and a breach of contract." 2 *id.* at ¶ 1593 (footnotes omitted).

The dispute herein involved precisely the consequence that the documentary transaction is intended to avert: Banylsa, which turned out to be an insolvent buyer, was given possession of goods for which it had not paid. This result would have been avoided had Lloyd, in keeping with its obligation, demanded the production of the bill of lading before permitting Banylsa to claim the caprolactam.

 Before we can hold Lloyd liable for causing Allied's loss, however, we must examine the respective rights and obligations of the parties at the time of the apparent misdelivery to determine whether Lloyd was somehow relieved of its duty to take up the bill of lading. Although the cargo had been discharged from the ship and, thus, the actual carriage completed when the apparent misdelivery occurred, the relationship between Allied and Lloyd was still governed by the contract of carriage. *See Leather's Best*, 451 F.2d at 807. Our analysis begins with the bill of lading, the document evidencing the contract of carriage. *David Crystal*, 339 F.2d at 297. We bear in mind that bills of lading are contracts of adhesion and, as such, are strictly construed against the carrier. *The Caledonia*, 157 U.S. 124, 137, 15 S.Ct. 537, 542, 39 L.Ed. 644 (1895); *West India Industries v. Tradex*, 664 F.2d 946, 951 n. 9 (5th Cir.1981); *Mitsui & Co. v. American Export Lines*, 636 F.2d 807, 822–23 (2d Cir.1981); *E. Gerli & Co. v. Cunard S.S. Co.*, 48 F.2d 115, 116 (2d Cir.1931) (L. Hand, *J.*).

Lloyd contends that clauses 1 and 12 of the bill of lading absolve it from liability. Clause 1 provides that "[t]he Carrier shall not be liable in any capacity whatsoever for any delay, non-delivery or mis-delivery, or loss of or damage to the goods occurring while the goods are not in the actual custody of the Carrier." J.App. at 32. Clause 12 provides that "[t]he responsibility of the Carrier, in any capacity, shall altogether cease and the goods shall be considered to be delivered and at their own risk and expense in every respect when taken into the custody of customs or other authorities." J.App. at 34.

 Lloyd's reliance on these clauses is unavailing because they are null and void. In *David Crystal*, 339 F.2d at 297, we held clauses similar to 1 and 12 to be invalid under the Harter Act's proscriptions against certain limitations on carriers' liability. *See* 46 U.S.C. § 190 (Supp. I 1983). Although the enactment of COGSA sharply curtailed the applicability of the Harter Act, 46 U.S.C. § 190 *et seq.* (Supp. I 1983), to ocean bills of lading and matters of ocean carriers' liability, absent a valid agreement to the contrary, the Harter Act still governs prior to loading and after discharge of cargo until proper delivery is made.[3] *Caterpillar Overseas, S.A. v. S.S. Expeditor*, 318 F.2d 720, 722–23 (2d Cir.), *cert. denied*, 375 U.S. 942, 84 S.Ct. 347, 11 L.Ed.2d 272 (1963); G. Gilmore & C. Black, *supra*, at 147–48. While a carrier and a shipper may specify by agreement what the responsibility of the carrier should be after the goods are discharged, the carrier may not simply disclaim all post-discharge responsibility. *Leather's Best*, 451 F.2d at 807 n. 5.

 Insofar as Lloyd relies on these clauses as agreements not to eliminate but merely to reduce its liability, which would be permissible under the Harter Act, its arguments are unavailing because the district court found that the parties did not

---

**3.** Where goods are shipped under an order bill of lading, it would seem logical to include in any definition of proper delivery the fulfillment of the carrier's duty to ensure, absent specific agreement to the contrary, that the cargo is released to the holder of the properly endorsed bill.

intend the clauses to have that effect. It is undisputed that the parties agreed that COGSA, which by its terms does not apply either before loading or after discharge of cargo, 46 U.S.C. § 1311, was to govern before the goods were loaded and after they were discharged from the ship. This was a permissible agreement, *see Colgate Palmolive Co. v. S/S Dart Canada,* 724 F.2d 313, 315 (2d Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 2181, 80 L.Ed.2d 562 (1984), and made COGSA "apply [not] of its own force as a statute, but merely as a contractual term in the bill of lading." [4] *Id.* Because COGSA § 1303(8) provides that the parties may not, except as otherwise provided by COGSA (see our discussion below), agree even to lessen the carrier's liability for loss arising from its own negligence or fault, and COGSA was incorporated into the bill of lading, the court's finding that clauses 1 and 12 of the bill of lading did not lessen Lloyd's liability for its negligent misdelivery is not clearly erroneous.

■ While it is clear, then, that Lloyd retained some responsibilities after discharge, the bill of lading did not specify what they might be. Therefore, "the law steps in to fill the lacuna" and provides that when Lloyd discharged the cargo, it assumed the status of a bailee. *David Crystal,* 339 F.2d at 298; *Leather's Best,* 451 F.2d at 811–12. The transfer of the cargo to the port authority, without more, did not alter this status; thus Lloyd remained presumptively responsible for the proper delivery of the goods. *Leather's Best,* 451 F.2d at 812; *David Crystal,* 339 F.2d at 298. We have previously articulated the applicable standard of responsibility under admiralty law: "a bailee is absolutely liable for misdelivering cargo, unless his mistake as to the person entitled to receive the goods was induced by the bailor" or the contract of carriage otherwise reduced or eliminated his liability. *David*

*Crystal,* 339 F.2d at 298. There is no suggestion in the record that Allied induced the misdelivery. Allied was not even aware until well after the event that Banylsa had acquired possession of the goods. We have already noted that the parties could not lawfully agree to eliminate Lloyd's liability entirely and have upheld the district court's finding that they did not intend that clauses 1 and 12 would lessen Lloyd's liability for negligent misdelivery.

The remaining question is whether the parties intended, by their incorporation of COGSA, that any provision of COGSA itself would lessen Lloyd's liability for negligent misdelivery. One important consequence of the enactment of COGSA was the elimination of absolute liability of carriers. Under COGSA, carriers can be liable for loss of or damage to cargo only on the basis of fault. G. Gilmore & C. Black, *supra,* at 150. After describing a number of specific duties, the statute provides somewhat generally, in language that seems relevant to this case, that the carrier shall not be liable for losses resulting from

> [a]ny … cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier, but the burden of proof shall be on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contributed to the loss or damage.

46 U.S.C. § 1304(2)(q).

■ Unfortunately for Lloyd, however, this provision seems to support rather than undermine the imposition of liability for the misdelivery. COGSA specifically left unaffected the applicability of the Pomerene Bills of Lading Act, 49 U.S.C. § 81 *et seq.* (1982), to ocean bills of lading. Pursuant to the Pomerene Act, a carrier operating under an order bill of lading is justified in

---

**4.** We reject Lloyd's argument that COGSA's remedies are exclusive under these circumstances. The wholesale incorporation into the bill of lading of COGSA's terms does not suffice to extinguish the shipper's right of action for mis-

delivery. We are particularly loath to liberally construe general language in a contract of adhesion to the obvious advantage of the drafting party.

delivering the goods to one lawfully entitled to them or to one in possession of an order bill "by the terms of which the goods are deliverable to his order; or which has been indorsed to him, or in blank by the consignee." 49 U.S.C. § 89. When Lloyd caused the goods to be released to Banylsa, by means of the carta declaratoria, the bill of lading was still in the custody of the Brazilian bank because payment had not been made on the sight draft. Not having paid on the draft, Banylsa was neither lawfully entitled to the goods nor in possession of the bill. Delivery to Banylsa, therefore, was not justified. In light of its unjustified authorization of the delivery, Lloyd could not possibly show, as required by section 1304(2)(q) of COGSA, that it did not by its actual fault contribute to Allied's loss.

■ Having found nothing in the contract of carriage that eliminates or reduces the carrier's duty to deliver the cargo only to a party in possession of the bill of lading paid to his order or properly endorsed, we conclude that the district court correctly determined that Lloyd should be liable for the loss that resulted from its misdelivery. *See* 49 U.S.C. § 90; *see also Pere Marquette Ry. v. J.F. French & Co.*, 254 U.S. 538, 546, 41 S.Ct. 195, 198, 65 L.Ed. 391 (1921); *Alderman Brothers Co. v. New York, N.H. & H.R.R.*, 102 Conn. 461, 465, 129 A. 47 (1925).

The fact that the government controlled port authority, rather than Lloyd itself, physically delivered the goods to Banylsa does not in any way relieve Lloyd from liability. As previously noted, it is undisputed that unless Banylsa presented to the port authority either the original bill of lading or a carta declaratoria issued by the carrier, the port authority would not have permitted Banylsa to take the cargo. Because Banylsa did not pay the sight draft and take possession of the bill of lading, Lloyd retained control over the goods. Thus, Lloyd acted at its peril when it authorized the release of the goods to Banylsa

without demanding production of the bill. *The Cabo Villano*, 14 F.2d at 979–81.

It is surely obvious at this point that Lloyd's Brazilian law arguments are inapposite. The rights and obligations of the parties herein are rooted in United States law. Both COGSA, 46 U.S.C. § 1300, and the Harter Act, 46 U.S.C. § 190, cover transactions involving carriage from ports in the United States to foreign ports. Moreover, Lloyd's own bill of lading provided that it should "be construed and the rights of the parties thereunder determined according to the law of the United States." J.App. at 34.

■ Finally, Allied's claim and partial recovery against Banylsa in the receivership proceeding did not extinguish Allied's right of action against Lloyd. By misdelivering the caprolactam to Banylsa, Lloyd was responsible for Allied's loss. Allied is entitled to be compensated for the full amount of its loss in United States dollars. Of course, the amount that Allied has already recovered from Banylsa must be considered in mitigation of the damages that Lloyd must pay.[5]

### D. *Damages*

Citing both COGSA and clause 17 of the bill of lading, Lloyd claims that its liability is limited to $500 per pallet or $75,000 ($500 × 150 pallets). Section 1304(5) of COGSA, which Lloyd argues is applicable through the express extension of COGSA contained in the bill of lading, provides in pertinent part that the carrier shall not be liable for loss of or damage to cargo in an amount greater than $500 per package "unless the nature and value of [the] goods have been declared by the shipper before shipment and inserted in the bill of lading. This declaration, if embodied in the bill of lading, shall be prima facie evidence, but shall not be conclusive on the carrier." Clause 17 of the bill of lading provides in relevant part that the carrier's liability for damages

---

**5.** We express no opinion at this time as to whether the entire prior recovery would be similarly considered to mitigate the award against a

carrier who can successfully claim a statutory or contractual limitation on damages.

shall be identically limited "unless the nature and value of [the] goods have been declared by the shipper before shipment and inserted in the Bill of Lading and extra freight paid." J.App. at 34. The parties apparently agree that the term "package" has the same meaning in COGSA and clause 17. We therefore need not on that ground distinguish between the COGSA and the clause 17 limitations.

Allied maintains that the district court properly refused to limit damages because Lloyd failed to plead the limitation as a special defense and never moved to amend its answer to include the defense. Our Circuit has never addressed whether a partial limitation is waived if not pleaded as a special defense. We need not decide it here because Allied also argues that the district court was correct because the pallets should not be considered to be the packages. Therefore, Allied claims, the limitation is irrelevant. We agree.

■ The question of what constitutes a COGSA package, a question we frequently confront, is largely and in the first instance a matter of contract interpretation. *Allied International American Eagle Trading Corp. v. S.S. "Yang Ming,"* 672 F.2d 1055, 1057, 1061 (2d Cir.1982); *Standard Electrica, S.A. v. Hamburg Sudamerikanische Dampfschifffahrts-Gesellschaft,* 375 F.2d 943, 946 (2d Cir.), *cert. denied,* 389 U.S. 831, 88 S.Ct. 97, 19 L.Ed.2d 89 (1967). The most obvious place for us to begin our search for the intent of the contracting parties is, of course, the bill of lading. *Binladen BSB Landscaping v. M.V. "Nedlloyd Rotterdam,"* 759 F.2d 1006, 1012 (2d Cir.1985). The bill of lading herein contained six columns under the usual general heading, "Particulars Furnished by Shipper." Only two of those columns and only a few of the items appearing in those columns are important to our decision. The first column, headed "No. of Pkgs.," contained the entry "150." Immediately to the right of that number, squarely in the column labeled "Description of Packages and Goods," was entered "Double Faced Pallets Said to Contain: 6000 Bags Caprolactum [sic]." Just above this entry, in the same

column, it stated "Rate: $110.00 LT Value: $1657.00 LT." The abbreviation LT stands for long ton, the equivalent of 2,240 pounds.

■ We have long accepted that a pallet may, under appropriate circumstances, be deemed to be a package. *Yang Ming,* 672 F.2d at 1062; *Standard Electrica,* 375 F.2d at 946. This may be so even where the containers on the pallet themselves constitute ordinary commercial units. Moreover, in *Yang Ming* we ruled that where, as here, the shipper gives written notice in the bill of the number of containers on the pallets, the carrier is not necessarily bound to that number if the bill elsewhere lists the number of pallets as the number of packages. *Yang Ming,* 672 F.2d at 1061. Thus the bill of lading could support either the shipper's or the carrier's position; it is not determinative. We do note, however, that in *Yang Ming,* the number of pallets was declared several times in the bill of lading to be the number of packages. *Id.* at 1063. We therefore were reasonably certain that the parties intended the pallets to constitute packages for limitations purposes. Here, however, the number of pallets was listed but once—as was the number of bags. Looking only at the numbers, we would conclude that the parties' intent is ambiguous.

■ But the bill contains another and potentially more significant entry—the freight charge—which we believe indicates that the parties did not intend the pallets to be packages. Lloyd contends that it would have charged a higher rate if it was potentially liable for the full value of the goods. Indeed, clause 17 explicitly and COGSA implicitly "cast upon the shipper the burden of declaring the nature and value of the goods, and paying a higher tariff, if necessary, [in order to] impose a higher liability upon the carrier." *Standard Electrica,* 375 F.2d at 945.

The excerpts cited from the bill of lading show that Allied adequately met its burden to declare the nature and value of the goods. And, despite Lloyd's attempts to introduce new evidence at this stage, we are limited to the record, and the record

clearly shows that the freight rate was based on the value of the goods. Caprolactam valued at less than $2,000 per long ton was charged a rate of $110 per long ton. J.App. at 165. More valuable caprolactam was charged a rate of $131.50 per long ton. *Id.* Thus, under the applicable tariff, Allied had no option to pay a higher rate. Having paid a freight charge based on the value of the goods, Allied could reasonably have expected to recover their value if they were lost. Similarly, having levied a rate keyed to value, Lloyd could reasonably have expected to be liable for that value. It would be illogical to ascribe a contrary intent to the parties.

As a final point, we reiterate that ocean bills of lading are contracts of adhesion. Ambiguities, therefore, must be resolved against the issuing carrier. *Mitsui & Co. v. American Export Lines,* 636 F.2d at 822–23. We conclude that the district court's finding that the parties did not intend the pallets to be packages was not clearly erroneous. Therefore, we affirm the district court's award of damages.

## CONCLUSION

The judgment of the district court is affirmed. Appellant is liable for costs.