940 F.2d 530
 1991 A.M.C. 2888
 C-ART, LTD., Plaintiff-Appellee,
v.
HONG KONG ISLANDS LINE AMERICA, S.A., Defendant-Appellant,
and
Precious Shipping Company, S.A.; Hong Kong Treasure
Shipping Company, S.A.; New Pioneer Shipping
Company, S.A.; Hong Kong America
Shipping Company, S.A., et
al., Defendants.
 No. 89-56090.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 9, 1990.
Decided Aug. 5, 1991.
 
 David E.R. Woolley, Williams, Woolley, Cogswell, Nakazawa & Russell, Long Beach, Cal., for defendant-appellant.
 Jerry S. Phillips, Friedman & Phillips, Los Angeles, Cal., for plaintiff-appellee.
 Appeal from the United States District Court for the Central District of California.
 Before HUG, CANBY and WIGGINS, Circuit Judges.
 HUG, Circuit Judge:
 
 I.
 
 1
 This case involves a shipment of goods by an ocean carrier from Hong Kong to California. C-ART, Ltd. ("C-ART"), an exporter of goods based in Hong Kong, had a contract with the New York Merchandising Company ("NYMCO"), a New York importing company, for the purchase of goods from manufacturers in Hong Kong. The goods were shipped by Hong Kong Islands Line America, S.A. ("HKIL"), an ocean carrier, from Hong Kong to California.
 
 
 2
 Between January and March 1986, C-ART purchased goods from various Hong Kong manufacturers and arranged for their shipment to NYMCO in California. Upon delivery of each shipment of goods to HKIL in Hong Kong, HKIL issued to CART a bill of lading[1] which C-ART would in turn present to a bank to exchange for payment from NYMCO. Under the scenario contemplated by the express terms of the bill of lading, NYMCO would ultimately receive the original bills of lading in exchange for its proper payment to C-ART for the goods. NYMCO would then present these bills of lading to HKIL upon the arrival of its ship in California in order to take possession of the goods.
 
 
 3
 Under the parties' prior course of dealing in this case, however, rather than waiting to receive the bills of lading to release the goods, HKIL would instead release the goods upon NYMCO's presentment of a "bank guarantee," which in effect would absolve HKIL of liability for any claim of misdelivery of the goods without a properly endorsed original bill of lading. The shipments at issue here, however, were released by HKIL to NYMCO upon the presentment of a mere NYMCO "corporate guarantee," which contained no security guarantee from a bank.
 
 
 4
 Shortly after HKIL's release of the goods to NYMCO based solely on the corporate guarantee but before C-ART had been paid, NYMCO filed for bankruptcy under Chapter 11 of the Bankruptcy Code. After unsuccessfully attempting to recover payment for the goods from NYMCO, C-ART filed the present suit against HKIL for misdelivery of the goods without a properly endorsed bill of lading. The district court ruled in favor of C-ART and entered judgment for $185,997.65. HKIL appeals and we affirm.
 
 II.
 
 5
 This case requires us to determine whether HKIL, the ocean carrier, misdelivered goods shipped by C-ART in Hong Kong to NYMCO, an importer in California. Thus, as a "shipment of goods by sea [it] is the sort of traditional maritime activity which falls squarely within the district court's admiralty jurisdiction." Genetics Int'l v. Cormorant Bulk Carriers, Inc., 877 F.2d 806, 808 (9th Cir.1989) (citing 1 Benedict on Admiralty, Secs. 181, 182, p. 12-4 (7th ed. 1989)) (other citation omitted); 28 U.S.C. Sec. 1333(1) (1988). As a result, this court applies substantive rules of maritime law. Genetics, 877 F.2d at 808.
 
 III.
 
 6
 C-ART claims it is entitled to recovery because HKIL's misdelivery of the goods constitutes a breach of a contract between C-ART and HKIL for shipment of the goods. Specifically, C-ART's argument is premised on HKIL's issuance of a bill of lading to C-ART upon C-ART's delivery of the goods to HKIL's vessel. The bill of lading issued by HKIL designated goods as consigned "to order of shipper" and its express terms required the goods to only be delivered "upon surrender of the original, properly endorsed bill of lading."
 
 A.
 
 7
 We agree with other circuits that have held that bills of lading constitute "contracts of carriage" between a shipper and carrier and, as contracts of adhesion, are "strictly construed against the carrier." Interocean S.S. Corp. v. New Orleans Cold Storage and Warehouse Co., Ltd., 865 F.2d 699, 703 (5th Cir.1989); Allied Chem. Int'l Corp. v. Companhia De Navegacao Lloyd Brasileiro, 775 F.2d 476, 482 (2d Cir.1985) (citing The Caledonia, 157 U.S. 124, 137, 15 S.Ct. 537, 542-43, 39 L.Ed. 644 (1895); West India Indus. v. Tradex, 664 F.2d 946, 951 n. 9 (5th Cir.1981); Mitsui & Co. v. American Export Lines, 636 F.2d 807, 822-23 (2d Cir.1981); E. Gerli & Co. v. Cunard S.S. Co., 48 F.2d 115, 116 (2d Cir.1931) (L. Hand, J.)), cert. denied, 475 U.S. 1099, 106 S.Ct. 1502, 89 L.Ed.2d 903 (1986). "Absent a valid agreement to the contrary, the carrier, the issuer of the bill of lading, is responsible for releasing the cargo only to the party who presents the original bill of lading." Allied, 775 F.2d at 481. " 'Delivery to the consignee named in the bill of lading does not suffice to discharge the [carrier] where the consignee does not hold the bill of lading.' " Id. (quoting 2 T.G. Carver, Carriage by Sea p 1593 (R. Colinvaux 13th ed. 1982)). Thus, "[i]f the carrier delivers the goods to one other than the authorized holder of the bill of lading, the carrier is liable for misdelivery," resulting in a "prima facie ... conversion of the goods and a breach of contract." Id. at 481-82 (citations omitted).
 
 
 8
 In this case, it is undisputed that the terms of the bill of lading required HKIL to obtain from NYMCO the original, properly endorsed bill of lading prior to delivery of the goods. It is also undisputed that HKIL delivered the goods without the bill of lading, instead relying on NYMCO's corporate guaranty. We therefore conclude that HKIL is liable to C-ART for its misdelivery of the goods.[2]
 
 B.
 
 9
 In its defense, HKIL argues that misdelivery could not have occurred because NYMCO had title to the goods from the time the goods were delivered to the ship in Hong Kong and therefore had the exclusive and immediate right to possession of the goods upon arrival of the ship in California. This argument is inimical to the express provisions of the bill of lading, as well as contradictory to the applicable authorities. See Allied, 775 F.2d at 481 (possession of original bill of lading entitles buyer to possession of goods and conveys title ); Black's Law Dictionary (5th ed. 1979) at 152 (bill of lading constitutes documentary evidence of title to goods). Although the goods were shipped "F.O.B. Hong Kong," with NYMCO consequently bearing the risk of loss from the time the goods were delivered to HKIL's ship in Hong Kong, it is undisputed that NYMCO never paid C-ART for the goods. In this case, therefore, the bill of lading controls.
 
 
 10
 HKIL also argues that Allied and Interocean are distinguishable because the bill of lading used in this case was not negotiable at the time C-ART attempted to exchange it for value at NYMCO's Hong Kong bank. There is no question, however, that but for NYMCO's insolvency, the bill of lading would have been negotiable. Prior to NYMCO's insolvency, undisputed evidence showed that it was C-ART's normal practice to exchange the bill of lading for dollar value against NYMCO's letter of credit at its Hong Kong bank. There is no merit, therefore, to HKIL's argument that the bill of lading should not be given its intended effect because NYMCO was insolvent at the time it was presented to the bank. On the contrary, upholding this argument would encourage the type of misdelivery during a buyer's insolvency that the bill of lading and its underlying policy considerations are designed to protect. See Allied, 775 F.2d at 481 (shipping documents, including bill of lading, "enable[ ] the distant seller to protect himself from an insolvent or fraudulent foreign buyer by ensuring that the buyer ordinarily cannot take possession of the goods until he has paid for them"). Instead, we conclude that here, as in Allied, "an insolvent buyer ... was given possession of goods for which it had not paid," creating a dispute that is "precisely the consequence that the documentary transaction is intended to avert. Id. at 482.
 
 
 11
 Finally, HKIL contends that the agreement between NYMCO and C-ART involved a principal/agency rather than a purchaser/seller relationship. According to HKIL, therefore, C-ART, as NYMCO's buying agent, lacks standing to sue HKIL for its misdelivery of the goods, or, alternatively, is not the real party in interest. We are not persuaded. The district court found that C-ART shipped the goods to NYMCO as an independent seller, rather than in a capacity as NYMCO's buying agent. We conclude that this finding was not clearly erroneous. See Trinidad Corp. v. S.S. Keiyoh Maru, 845 F.2d 818, 822 (9th Cir.1988).
 
 
 12
 Max Fradkin, the then vice-president of NYMCO, testified that NYMCO never dealt directly with any of the manufacturers, did not know the price C-ART paid its manufacturers when NYMCO placed its purchase order with C-ART, and did not know what profit C-ART was making on the goods. Lionel Chan, C-ART's managing director, testified that he never advised NYMCO of the price C-ART was paying the manufacturers. According to Fradkin, NYMCO never agreed to pay the manufacturers directly but were instead only obligated to pay C-ART for the goods. Thus, the evidence supports the conclusion that only C-ART dealt directly with manufacturers who were both chosen and paid by C-ART. In sum, HKIL has failed to point to any evidence in support of its agency theory that would indicate that C-ART's method of purchasing goods from the Hong Kong manufacturers was in any way subject to NYMCO's control. See Nelson v. Serwold, 687 F.2d 278, 282 (9th Cir.1982) (noting that the basic characteristic of an agent is one who "acts for or on behalf of the principal and subject to his control").
 
 
 13
 HKIL has similarly failed to point to any evidence characteristic of another essential element of an agency relationship; that C-ART possessed the capacity to bind NYMCO to the transactions made with the Hong Kong manufacturers. See Whisper Soft Mills, Inc. v. NLRB, 754 F.2d 1381, 1386 (9th Cir.1984). There is no evidence that NYMCO had any independent relationship with the Hong Kong manufacturers. Instead, the evidence showed that its dealings were solely with C-ART. Finally, there is no evidence that the manufacturers considered NYMCO, rather than C-ART, to be the ultimate purchaser of the goods.
 
 
 14
 The only meaningful support for HKIL's agency theory involves various documents used in the shipping process that indicate that C-ART contracted to act as NYMCO's buying agent in Hong Kong in return for a buying commission. C-ART does not dispute that these documents, most notably the original C-ART/NYMCO agreement, indicate a principal-agent relationship. For example, the January 10, 1977 "Buying Agency Agreement" letter states that NYMCO "hereby appoints C.ART Ltd. as a Buying Agent in Hong Kong," and that "C.ART Ltd. will be entitled to a buying commission of up to 8%...." The agreement is then signed by a vice-president of NYMCO and a representative of C-ART. HKIL also relies on United States Customs Service document ("Customs Form 5515"), along with C-ART "Commission Invoices," that expressly include a "buying commission" for goods shipped from Hong Kong as part of NYMCO's total Hong Kong purchase price.
 
 
 15
 It is well established, however, that the parties' own characterization of the relationship is not necessarily dispositive. See Nelson, 687 F.2d at 282. The actual dealings and course of conduct between the parties is also to be considered. See Whisper Soft, 754 F.2d at 1386; see also Pan Am. World Airways v. Shulman Transp. Enter., Inc. (In re Shulman Transp. Enter., Inc.), 744 F.2d 293, 295 (2d Cir.1984) ("A debtor does not become the agent of his creditor simply because he is called an agent.") (citing Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 354, 42 S.Ct. 360, 361-62, 66 L.Ed. 653 (1922)).
 
 
 16
 Here, the district court found that the "buying commissions" indicated on these documents were actually an accommodation on the part of C-ART to allow NYMCO to avoid paying customs duties on that portion of the total purchase price designated as C-ART's "commissons."[3] The district court further found that the amount of these commissions did not necessarily have any correlation to C-ART's actual markup or profits on its sale of the goods to NYMCO. We conclude that these findings are well supported by the evidence presented at trial and therefore agree with the decision of the district court.[4]
 
 
 17
 Accordingly, C-ART, as shipper of the goods, has a "personal stake" in the outcome of the case and therefore standing to bring suit against HKIL for misdelivery of the goods, and is the real party in interest under Fed.R.Civ.P. 17(a). See generally EMI, Ltd. v. Bennett, 738 F.2d 994, 996 (9th Cir.), cert. denied, 469 U.S. 1073, 105 S.Ct. 567, 83 L.Ed.2d 508 (1984); Pacific Coast Agric. Export Ass'n v. Sunkist Growers, Inc., 526 F.2d 1196, 1208 (9th Cir.1975), cert. denied, 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976).
 
 IV.
 
 18
 The district court's judgment in favor of C-ART is AFFIRMED.
 
 
 
 [1]
 A "bill of lading" constitutes a "receipt for goods, contract for their carriage, and is documentary evidence of title to goods." Black's Law Dictionary (5th ed. 1979) at 152
 
 
 [2]
 We also conclude that HKIL is liable for misdelivering the goods in its capacity as a bailee. The Second Circuit has held that "a bailee is absolutely liable for misdelivering cargo, unless his mistake as to the person entitled to receive the goods was induced by the bailor or the contract of carriage [i.e., the bill of lading] otherwise reduced or eliminated his liability." Allied, 775 F.2d at 483 (citation omitted). Here, there is no contention or evidence that C-ART induced the misdelivery or that the bill of lading curtailed HKIL's liability. The Second Circuit justifies application of this rule to maritime transactions based on considerations of uniformity and certainty, and because the rule represents "a sound allocation of responsibility for the bailee is in a better position than the bailor to establish procedures to minimize the risk of misdeliveries and to insure against the few misdeliveries that will inevitably occur despite the most careful precautions." David Crystal, Inc. v. Cunard S.S. Co., Ltd., 339 F.2d 295, 298 (2d Cir.1964), cert. denied, 380 U.S. 976, 85 S.Ct. 1339, 1340, 14 L.Ed.2d 271 (1965)
 
 
 [3]
 Selling commissions incurred by buyers with respect to imported merchandise are not subject to customs duties. See 19 U.S.C. Sec. 1401a(b)(1)(B) (1988)
 
 
 [4]
 In upholding the district court's findings that the non-existent "commission" arrangement was actually a ruse to avoid payment of customs duties, we certainly do not condone what appears to be an admitted disregard of United States Customs laws. Any such violation is a matter for consideration by federal agencies and not a matter to be resolved in this appeal