**INTEROCEAN STEAMSHIP CORPORATION and Transport Intermediaries Mutual Insurance Association, Ltd.**

v.

**NEW ORLEANS COLD STORAGE AND WAREHOUSE COMPANY, LTD. and NOCS International, Ltd.**

Civ. A. No. 86–1597.

United States District Court, E.D. Louisiana.

Oct. 23, 1987.

Andrew T. Martinez, New Orleans, La., for plaintiffs.

Douglas A. Kewley, Metairie, La., Raymond J. Salassi, Jr., New Orleans, La., for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

BEER, District Judge.

This matter came on for trial before the Court, without a jury, on July 30, 1987 (and subsequent days). Thereafter, on September 1, 1987 the Court entered an order that the record in the case remain open until October 14, 1987 for the purpose of filing additional depositions which have now been timely filed and considered. After hearing the evidence and reviewing the documents filed by the parties, the Court makes the following Findings of Fact and Conclusions of Law. To the extent that any finding of fact represents a conclusion of law, it is

adopted as such. To the extent that any conclusion of law represents a finding of fact, it is adopted as such.

## FINDINGS OF FACT

1. At all times hereinafter mentioned, Interocean Steamship Corporation (hereinafter Interocean) was, and is, a corporation organized and existing under and by virtue of the laws of the State of California, with an office in the City of New Orleans, Louisiana, and at all times hereinafter mentioned acted as a steamship agent for A.B.C. Containerline N.V. (hereinafter ABC) and its vessel, the M/V ELLEN HUDIG.

2. At all times hereinafter mentioned, Transport Intermediaries Mutual Insurance Association, Ltd. (hereinafter Transport) was, and is, an insurance association organized and existing under and by virtue of the laws of Bermuda and at all times pertinent hereto insured Interocean against liabilities, loss and damage as are involved in this litigation.

3. At all times hereinafter mentioned, New Orleans Cold Storage and Warehouse Company, Ltd. (hereinafter Warehouse) was, and is, a corporation organized and existing under and by virtue of the laws of the State of Louisiana with an office and place of business in the City of New Orleans, Louisiana, engaged in unloading cargo from oceangoing containers, and in the refrigerated storage, warehousing preservation, and, in certain instances, delivery of goods.

4. At all times pertinent hereto, NOCS International, LTD. (hereinafter NOCSI) was, and is, a corporation organized and existing under and by virtue of the laws of the State of Louisiana with an office and place of business in the City of New Orleans, Louisiana, was a subsidiary corporation of Warehouse.

5. ABC, on or about March 16, 1985, issued two negotiable bills of lading to Wesfarmers Export of Fremantle, Australia (hereinafter Wesfarmers) consigned "to order" (notify Thallon of New York) each covering 600 cartons of frozen boneless beef in refrigerated shipping containers ANBU 2811203 and ANBU 2811667 aboard the M/V ELLEN HUDIG, Voyage Number 126, from Melbourne, Australia, to New Orleans, Louisiana.

6. Wesfarmers, the shipper, on obtaining the negotiable bills of lading issued by ABC, forwarded the negotiable originals and non-negotiable copies to Mellon Bank International in New York.

7. On or about April 23, 1985, the M/V ELLEN HUDIG arrived at New Orleans and discharged the two said oceangoing refrigerated shipping containers to the dock. Interocean sent written arrival notices to the notify party, Thallon, and a copy of the ship's manifest for the ELLEN HUDIG, Voyage 126, to Warehouse, who was to strip, tally, receive, and store the cargo from the containers discharged at New Orleans by the ELLEN HUDIG.

8. NOCSI, acting as custom house broker of Thallon, having received from Thallon meat certificates, the commercial invoices, and copies of other documents sought and apparently obtained Customs releases to permit the loaded containers of meat to move from the dock so that on April 30, 1985, the two loaded containers were trucked to Warehouse in New Orleans.

9. The two loaded containers were received by Warehouse on or about April 30, 1985. U.S. Department of Agriculture approval for importation was obtained and Warehouse discharged the cartons of frozen meat from the containers, tallied it, and placed it in refrigerated storage thereafter furnishing to Interocean an out-turn report setting forth the number of cartons received and the condition of the goods.

10. The cartons of meat were placed by Warehouse in refrigerated storage free of storage charges until approximately May 24, 1985, with storage charges thereafter to be for the account of the ultimate cargo owner and/or Thallon, the notify party named in the bill of lading.

11. On or about May 2, 1985, Warehouse sent Thallon two non-negotiable warehouse receipts covering the above described meat and advised that the cargo

had cleared Customs and the U.S. Department of Revenue.

12. Warehouse apparently concluded that the meat was ready for delivery, and could be sold and delivered to Thallon's customers.

13. Thallon sent meat certificates and non-negotiable documents which would permit NOCSI to obtain Customs clearances and U.S.D.A. import approval to NOCSI but no original bills of lading were forwarded. The Thallon form letter sending NOCSI the documents states that "originals to follow," when only non-negotiable copies were sent.

14. Thallon, by telephone, advised Warehouse on or about May 6, 1985 to deliver the 600 cartons of meat carried under one bill of lading to Texas A & M Food Service, which delivery was accomplished the same day; and on or about May 21, 1985, by telephone advised Warehouse to deliver the 600 cartons carried under the other bill of lading to Portion Control, which delivery was accomplished on that day. In neither instance did Warehouse contact ABC, Interocean or NOCSI.

15. Warehouse appears to have relied upon the oral advice of Thallon in making the deliveries above described.

16. On or about June 3, 1985, inquiries confirmed that the containers of boneless beef had been delivered by Warehouse to third parties without the negotiable ocean bills of lading issued by ABC to the shipper, Wesfarmers, having been negotiated and surrendered to the carrier.

17. Wesfarmers, the shipper of the beef, then had the original bills of lading returned to it and/or its representative by Mellon Bank International and made claim, as holder and owner of the bills of lading, and of the goods represented thereby, against ABC and the M/V ELLEN HUDIG in the amount of $77,218.00 (the amount of the commercial invoices) plus interest, for the loss of the cartons of meat. ABC, in turn, made claim for defense and indemnity against Interocean, who in turn made claim against Warehouse and NOCSI. Upon the denial by Warehouse and Interocean of the tender, Interocean and its underwriter, Transport, compromised and settled the claim of Wesfarmers by payment to it of $73,440.00, obtaining in exchange therefor a release from ABC and from Wesfarmers, with assignment by Wesfarmers and by ABC of all rights it/they had to prosecute claim for recovery and to retain the proceeds. This action then resulted.

18. No actionable improprieties pertinent in any way in these proceedings accompanied the performance of Mellon Bank International.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction under the admiralty and maritime laws of the United States and also has jurisdiction under 28 U.S.C. § 1332 because of diversity of citizenship among the parties and the amount in controversy.

2. ABC was liable to its shipper, Wesfarmers, as a matter of law for failing to make proper delivery to the holder and owner of the negotiable bills of lading, *Harter Act*, 46 U.S.C.App. § 190 et seq.; and as bailee and/or warehouseman of the goods, *Crystal v. Cunard Steamship, et al.*, 223 F.Supp. 273 (S.D.N.Y.1963), aff'd 339 F.2d 295 (2 C.A.1964).

3. Interocean, as ABC's steamship agent, was liable in turn to ABC by virtue of its duties, vicarious breach of warranty, and failure as agent to carry out the carrier's obligation safely to deliver the cargo as required by ABC's contract with the shipper. *Collins v. Panama R. Co.*, 197 F.2d 893, 896 (5 C.A.1952), and *Crystal* decision, *supra.*

4. The payment to Wesfarmers and resulting assignments by Wesfarmers and ABC to Interocean are therefore appropriate and legally enforceable; the amounts paid were less than the commercial invoice prices for the cargo as billed to Thallon by Wesfarmers, and, accordingly, also appropriate and enforceable.

5. NOCSI was obliged to inform Warehouse that it had not received and surrendered for cancellation the negotiable bills of lading.

6. Warehouse was obliged not to—even as a result of unintentional misdelivery through mistake—deliver the meat to Portion Control and Texas A & M.

7. Neither ABC nor Interocean caused Warehouse to misdeliver the consignments nor knew that Warehouse had delivered the cargo until some time after it had done so. Warehouse, therefore, is liable for the misdeliveries. Interocean and Transport are, accordingly, entitled to indemnification from Warehouse for the amount paid by it to Wesfarmers, as Warehouse was in a better position to prevent the misdelivery.

8. Counsel for Interocean and Transport are to prepare the judgment in accordance with the above findings and conclusions.