865 F.2d 699
 1989 A.M.C. 1250, 8 UCC Rep.Serv.2d 154
 INTEROCEAN STEAMSHIP CORPORATION and Transport
Intermediaries Mutual Insurance Association, Ltd.,
Plaintiffs-Appellees,
v.
NEW ORLEANS COLD STORAGE AND WAREHOUSE COMPANY, LTD., and
NOCS International, Ltd., Defendants-Appellants,
v.
MELLON BANK INTERNATIONAL, Third-Party Defendant-Appellee.
 No. 88-3017.
 United States Court of Appeals,
Fifth Circuit.
 Feb. 17, 1989.
 
 Bruce A. North, Douglas A. Kewley, Lawrence J. Molony, Molony, North & Hanewinckel, Metairie, La., for defendants-appellants.
 Andrew T. Martinez, Terriberty, Carroll & Yancey, New Orleans, La., for Interocean, et al.
 Raymond J. Salassi, Jr., Anne Horton Breaux, New Orleans, La., for Mellon Bank.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before CLARK, Chief Judge, and TIMBERS,* and RUBIN, Circuit Judges.
 ALVIN B. RUBIN, Circuit Judge:
 
 
 1
 The district court held a customhouse broker and warehouse responsible for misdelivering shipped beef without receiving negotiable bills of lading. Because the broker and warehouse had no duty to provide for proper delivery, we reverse that judgment.
 
 I.
 
 2
 ABC Containerline N.V., owner of the M/V Ellen Hudig, issued two negotiable bills of lading to Wesfarmers Export, Ltd. for two containers of frozen boneless beef to be transported from Melbourne, Australia, to New Orleans. The bills of lading were "to order" with instructions to notify John Thallon & Company, an importer who had agreed to buy the meat from Wesfarmers. Upon receiving the original negotiable bills of lading, Wesfarmers forwarded them, as well as non-negotiable duplicates, to Mellon Bank International in New York. Mellon Bank transmitted copies of these bills to Thallon.
 
 
 3
 A month later, Thallon notified New Orleans Cold Storage International, Inc. (NOCSI), its customhouse broker, that the two containers were on board the M/V Ellen Hudig. Thallon sent NOCSI the original meat certificates, commercial invoices, and copies of the bills of lading so NOCSI could "handle the ... documents" and clear the cargo through customs "in the usual manner." Thallon informed NOCSI that "Delivery Instructions" and "Original[ ] ... Bill(s) of Lading ... will follow."
 
 
 4
 Wesfarmers' two containers of frozen boneless beef, in addition to forty similar containers aboard the M/V Ellen Hudig, arrived at the port in New Orleans on April 23, 1985. Interocean Steamship Corporation, ABC's steamship agent, informed Thallon of their arrival, and sent New Orleans Cold Storage and Warehouse Company (Warehouse) a copy of the ship's manifest. Interocean hired Warehouse, NOCSI's parent company, to receive, strip, and tally the cargo from all 42 containers on board the M/V Ellen Hudig.
 
 
 5
 NOCSI cleared the two containers of beef through United States Customs and delivered them to Warehouse on April 30, 1985, as Thallon instructed. NOCSI delivered the containers, however, without their original, negotiable bills of lading; NOCSI never received the original bills from Thallon despite his notice that they were "to follow," and never notified Warehouse or Thallon of their absence.
 
 
 6
 After delivery, Warehouse stripped the containers, tallied the meat, and placed it in refrigerated storage. It then reported the quality and quantity of goods received to Interocean. Warehouse was to store the meat without charge until May 24, after which fees would be assessed against the ultimate cargo owner or Thallon.
 
 
 7
 On May 2, Warehouse sent Thallon non-negotiable receipts for the frozen beef. On May 6, at Thallon's oral request and expense, Warehouse delivered the contents of one container of beef to Texas A & M Food Service, and delivered the contents of the other container to Portion Control on May 21. Warehouse executed both deliveries without obtaining negotiable bills of lading and without informing ABC, Interocean, or NOCSI.
 
 
 8
 Wesfarmers, the holder of the original bills of lading, made claim against ABC for the loss of two containers of boneless beef. ABC asserted that it was due indemnity by Interocean, its steamship agent, and Interocean made claim against NOCSI and Warehouse for misdelivering the cargo without their negotiable bills of lading.
 
 
 9
 Interocean and Wesfarmers settled, subrogating to Interocean Wesfarmers' and ABC's remaining rights. The district court found that Mellon Bank committed "[n]o actionable improprieties," but held NOCSI and Warehouse jointly liable for the misdelivery: NOCSI was "obliged to inform Warehouse that it had not received and surrendered for cancellation the negotiable bills of lading," and Warehouse, "in a better position [than Interocean] to prevent the misdelivery," was "obliged not to--even as a result of unintentional misdelivery through mistake--deliver the meat to Portion Control and Texas A & M."[1] NOCSI and Warehouse appeal.
 
 II.
 
 10
 NOCSI contends that it had no duty to inform Warehouse that it had not received the original bills of lading. As a customhouse broker, NOCSI has a duty under 19 U.S.C. Sec. 1641(b)(4) to "exercise responsible supervision and control over the customs business that it conducts." Neither the statute nor the applicable regulations[2] clarifies this obligation further; neither mentions any duty imposed on a customhouse broker with respect to original bills of lading.
 
 
 11
 It is undisputed, however, that customhouse brokers do not ordinarily need to possess or even have access to original bills of lading to perform their limited function of clearing cargo through customs. The United States Customs Service is interested only in a ship's manifest and invoices for cargo, not in original bills of lading. Original bills of lading, vital to the delivery of and payment for shipped goods, play no role in inspection by customs. When, occasionally, NOCSI receives a bill of lading, it perfunctorily forwards the bill to the appropriate steamship agent. NOCSI cannot, therefore, be held responsible for failing to procure original bills of lading that play no part in the performance of its duties.
 
 
 12
 Nor did NOCSI have a duty, based upon the customary practice in the industry, to inform Warehouse that the original bills of lading had not been delivered to it. Peter Low, an expert steamship witness upon whose testimony Interocean relies, stated that if "documents are missing, [the customhouse broker ordinarily] ... make[s] efforts to find out where they are ... and get them or work up some kind of a certificate to present to the steamship line." Nowhere does Low intimate that a customhouse broker customarily informs a warehouse of the absence of original bills of lading. That NOCSI was a subsidiary of Warehouse cannot, by itself, establish that NOCSI had a duty to inform Warehouse that the bills of lading had not been presented.
 
 
 13
 NOCSI's only contractual relationship was with Thallon, for whom it served as customhouse broker. NOCSI, therefore, had no contractual duty to inform Warehouse that it did not receive the original bills.
 
 
 14
 Interocean, like NOCSI, knew that the original bills of lading were outstanding. While NOCSI, as customhouse broker, had no reason to keep apprised of the location of the bills, Interocean, as steamship agent, should have been keenly interested in the original bills, since it rarely releases cargo without them. Given Interocean's greater interest in, and equivalent knowledge of, the facts concerning the original bills of lading, and the absence of statutory, customary, or contractual obligation requiring NOCSI to transmit this information to Warehouse, it was erroneous for the district court to impose on NOCSI a duty to inform Warehouse of the status of the original bills.
 
 III.
 
 15
 Warehouse claims that it is not responsible for misdelivering the frozen boneless beef: Interocean was responsible solely for issuing the steamship release and assuring proper delivery, and Warehouse owed a duty only to Thallon to act reasonably.
 
 
 16
 A party's obligation to prevent misdelivery of shipped goods derives, in part, from the terms of the bill of lading. The "contract of carriage"[3] between a shipper and carrier enunciates the responsibility of the carrier to deliver enumerated goods to a specified location. As "contracts of adhesion" between the carrier and shipper, these bills are "strictly construed against the carrier."[4]
 
 
 17
 Under the applicable bills of lading, the carrier, ABC Containerline N.V., was responsible for delivering the frozen boneless beef from "h[ouse] to p[ier]." The bills stipulated:
 
 
 18
 A carrier's responsibility ... shall terminate without notice as soon as the goods leave the ship's tackle at the Port of Discharge ... where the Carrier is authorized to make delivery.... Any responsibility of the Carrier ... after leaving the ship's tackle ... shall not exceed that of an ordinary bailee.... [T]he Carrier shall not be liable for loss ... arising or resulting from ... misdelivery ... of ... the goods occurring while the goods are not in the actual custody of the carrier.
 
 
 19
 Once the containers had reached the designated locale, left the ship, and arrived at the warehouse, the terms of these bills of lading were satisfied. The contract did not give rise to any further obligations absent a "specif[ic] ... agreement" by the carrier and shipper.[5]
 
 
 20
 In order to effectuate "proper delivery" to the pier under the Harter Act,[6] ABC, through its shipping agent, Interocean, retained Warehouse to strip the containers. The contractual relationship by which Warehouse stripped containers did not transform it, however, into a "party to the contract of carriage and ... liable for breach of that contract;" Warehouse "had not signed the bill[s] of lading[, but] was merely performing the function of caring for the cargo until delivery--a contractual duty owed to the shipper in the first instance by [the carrier]" who is responsible for its agent's acts.[7] There is no evidence in the record of any other contractual arrangement between Warehouse and ABC or Interocean.
 
 
 21
 Interocean cannot, therefore, base its claim against Warehouse upon violation of the bills of lading or the Harter Act, since these contracts and the governing statute impose a duty only upon the carrier to ensure "proper delivery" at a "fit and customary wharf."[8] Absent a violation of the bills of lading or Harter Act, the district court's judgment can be upheld only if Warehouse was negligent in performing its custodial duties. The district court's finding of tortious conduct, based solely on Warehouse's actions on land, is not predicated on the bills of lading or maritime law, but rather, on the application of state law.[9]
 
 
 22
 Interocean contends that Warehouse is, however, liable under Louisiana law for failing to deliver the beef according to the terms of the bills of lading, for failing to cancel these documents, and for failing to obtain written instructions from the depositor before delivery.
 
 
 23
 Warehouse cannot be held liable for failing to deliver the boneless beef according to the terms of the bills of lading since it was not a party to these contracts and has neither rights nor responsibilities under them. Under Louisiana law,[10]
 
 
 24
 a depositary who in good faith including observance of reasonable commercial standards has received goods and delivered or otherwise disposed of them according to the terms of the document of title or pursuant to this Chapter is not liable therefor.
 
 
 25
 Warehouse acted in good faith and in observance of reasonable commercial standards when it delivered the goods to the party to whom Thallon ordered: Warehouse stored the cargo for its customer, Thallon, against whom it was prepared to assess storage charges, and delivered the beef at Thallon's request; it received no request from Interocean or ABC contravening Thallon's instructions; and it had no reason to know that the original bills of lading had not been satisfied.
 
 
 26
 Warehouse cannot be held liable on the alternative ground that it failed to cancel the documents under La.R.S. 10:7-403(3), which requires that
 
 
 27
 [u]nless the person claiming is one against whom the document confers no right ..., [the warehouse or carrier] must surrender for cancellation ... any outstanding negotiable document covering the goods, and the depositary must cancel the document ... thereon or be liable to any person to whom the document is duly negotiated.
 
 
 28
 Warehouse possessed no "outstanding negotiable document" to surrender or cancel; these records were kept by Mellon Bank in New York. The statutory requirements of La.R.S. 10:7-403(3) are, therefore, inapposite.
 
 
 29
 Similarly, La.R.S. 10:7-403(4), read in conjunction with 10:7-403(1), states that "[t]he depositary must deliver the goods to a person entitled under the document," which means "the person to whom delivery is to be made by the terms of or pursuant to written instructions under a non-negotiable document." The non-negotiable warehouse receipts did not specify, however, who was ultimately entitled to the goods; they stated only that Warehouse was storing the boneless beef for Thallon. Without a document identifying the person or party entitled to the containers, the "written instructions" requirement of La.R.S. 10:7-403(4) was not triggered.
 
 
 30
 Interocean could have prevented misdelivery by either storing the beef in its own name or by directing Warehouse to hold the cargo until it authorized release. A Warehouse employee testified at trial that were "the steamship company or its agents ... to ask the warehouse at any time to hold the goods, ... the warehouse [would have] honor[ed] that request[.]" Several witnesses testified that it was customary practice for Warehouse to deliver stored cargo to third parties without notifying the steamship agent, and Interocean never instructed Warehouse that its approval should be obtained before meat was released.
 
 
 31
 Owing no duty to Interocean under separate contract, maritime law, or state law to hold the boneless beef for delivery only on Interocean's instructions, Warehouse cannot be found responsible for delivering it to Texas A & M Food Service and Portion Control.
 
 IV.
 
 32
 NOCSI and Warehouse contend that Mellon Bank improperly handled the original bills of lading, and that Mellon had conflicting interests in the transaction when it both extended credit to Thallon and undertook to collect the bills of lading for Wesfarmers.
 
 
 33
 Mellon received the original bills of lading from Wesfarmers on April 4, 1985, with instructions to deliver the bills against payment or to notify the shipper immediately in the event of default. After repeated requests for payment from Thallon, Mellon returned the unpaid bills to Wesfarmers on June 19, informing Wesfarmers that Thallon had been placed in involuntary bankruptcy.
 
 
 34
 In handling the bills of lading, Mellon was required to exercise "ordinary care" and to notify Wesfarmers "seasonabl[y]" of non-payment of the bills of lading.[11] Mellon properly retained possession of the unpaid, original bills of lading through June 19, and diligently attempted to collect payment from Thallon each week. Thallon had delayed but ultimately completed other payments on several prior occasions.[12] Although Mellon retained the bills of lading for approximately ten weeks without notifying Wesfarmers of Thallon's delinquency, this action was reasonable under the circumstances created by the prior course of dealing.
 
 
 35
 Mellon did not breach any duty by extending credit to Thallon at the same time that it acted as the collecting agent for Wesfarmers. A collecting bank owes no duty to notify the party for whom it is collecting that it is also a creditor of the drawee unless suppression of that fact amounts to bad faith.[13] Mellon acted in good faith and with due diligence as collecting agent and creditor. So long as Mellon retained possession of the original bills of lading, it had no reason to believe that Thallon's payment on its debt to the bank derived from the sale of the frozen boneless beef named in these bills, and the bank could, therefore, use Thallon's receivables to service that debt. Moreover, Mellon had no obligation to reveal to a third party Thallon's financial condition before Thallon declared bankruptcy on May 24, 1985, and any information Mellon could have provided after that date would not have affected the May 6 and May 21 misdeliveries.
 
 
 36
 We find no fault on the part of Mellon Bank and, therefore, affirm the judgment of the district court with respect to the bank.
 
 
 37
 For the foregoing reasons, the judgment of the district court is REVERSED insofar as it imposed liability on NOCSI and Warehouse. Judgment will be entered dismissing these claims. The judgment of the district court dismissing the claim against Mellon is AFFIRMED.
 
 
 
 *
 Circuit Judge of the Second Circuit, sitting by designation
 
 
 [1]
 685 F.Supp. 131 (E.D.La.1987)
 
 
 [2]
 19 C.F.R. Ch. 1, Part 111, subpart C
 
 
 [3]
 Leather's Best, Inc. v. S.S. Mormaclynx, 451 F.2d 800, 807, 808 (2d Cir.1971). See G. Gilmore and C. Black, The Law of Admiralty 93 (2d ed.1975)
 
 
 [4]
 Allied Chemical v. Companhia de Navegacao, 775 F.2d 476, 482 (2d Cir.1985), cert. denied, 475 U.S. 1099, 106 S.Ct. 1502, 89 L.Ed.2d 903 (1986)
 
 
 [5]
 Allied Chemical, 775 F.2d at 482; Leather's Best, 451 F.2d at 807 n. 5. See also Caterpillar Overseas S.A. v. S.S. Expeditor, 318 F.2d 720, 724 (2d Cir.), cert. denied, 375 U.S. 942, 84 S.Ct. 347, 11 L.Ed.2d 272 (1963)
 
 
 [6]
 46 U.S.C.App. Sec. 190 et seq
 
 
 [7]
 Leather's Best, 451 F.2d at 807-08. See also Allied Chemical, 775 F.2d at 482; Caterpillar Overseas, 318 F.2d at 724
 
 
 [8]
 David Crystal, Inc. v. Cunard Steam-Ship Company, 223 F.Supp. 273, 282 (S.D.N.Y.1963), aff'd 339 F.2d 295 (2d Cir.1964), cert. denied, 380 U.S. 976, 85 S.Ct. 1339, 1340, 14 L.Ed.2d 271 (1965). See Caterpillar Overseas, 318 F.2d at 723, 724; Isthmian S.S. Co. v. California Spray-Chemical Corp., 290 F.2d 486 (9th Cir.1961), aff'd as modified on rehear'g, 300 F.2d 41 (9th Cir.1962); Morse Electro Products Corp. v. S.S. Great Peace, 437 F.Supp. 474, 486 (D.N.J.1977); Gilmore and Black at 96
 
 
 [9]
 Leather's Best, 451 F.2d at 808. Compare David Crystal at 282-87
 
 
 [10]
 La.R.S. 10:7-404
 
 
 [11]
 U.C.C. Sec. 1-204(2). See Southern Cotton Oil Co., Inc. v. Merchants National Bank, 670 F.2d 548, 550 (5th Cir.1982)
 
 
 [12]
 See Southern Cotton Oil, supra
 
 
 [13]
 Thack v. First National Bank & Trust Co., 206 F.2d 180, 183 (5th Cir.1953)