**POLYGRAM GROUP DISTRIBUTION, INC., Plaintiff,**

v.

**TRANSUS, INC., Defendant.**

**Civil Action No. 1:96–CV–0134–JOF.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 30, 1997.

Frank William DeBorde, Morris, Manning & Martin, Atlanta, GA, for Plaintiff.

Stephen H. Goodloe, Sales, Goodloe & Golden, Atlanta, GA, Lawrence J. Roberts, Hinshaw & Culbertson, Miami, FL, for Defendant.

## ORDER

FORRESTER, District Judge.

This matter is before the court on cross-motions for summary judgment [14–1, 16–1].

## I. STATEMENT OF UNDISPUTED FACTS

Plaintiff PolyGram Group Distribution, Inc. ("PolyGram"), of Indianapolis, Indiana, distributes audio and video products for and on behalf of PolyGram records, Inc., and other affiliates. Defendant Transus, Inc. ("Transus"), is a Georgia corporation in the business of transporting and delivering freight throughout the United States. This action arises pursuant to the Federal Bills of Lading (Pomerene) Act, 49 U.S.C. §§ 81–124,[1] and the 1906 Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 11707,[2] for damages stemming from the alleged loss of an interstate shipment of goods. PolyGram has also asserted a cause of action to recover attorney's fees and costs pursuant to O.C.G.A. § 13–6–11 for stubborn litigiousness.

1. These sections have subsequently been recodified at 49 U.S.C. § 80101, *et seq.*

2. The Carmack Amendment has been recodified at 49 U.S.C. § 14706.

On September 24, 1993, Musicland Group, Inc., d/b/a Media Play ("Media Play") of Minnetonka, Minnesota, ordered sixty-seven (67) cartons of sound recordings ("the merchandise") from PolyGram. Media Play instructed PolyGram in the purchase order to ship the merchandise to its distribution center in Minneapolis, Minnesota. Media Play intended to sell the merchandise out of a new Media Play store in Gainesville, Florida ("the new store"). The new store, which was located at Newberry Crossing at 1009 N.W. 76th Boulevard, Gainesville, Florida, 32606, was not yet open for business. Polygram, however, did not ship the merchandise in accordance with Media Play's instructions. Rather than sending the merchandise to the distribution center in Minneapolis, Minnesota, Polygram shipped the merchandise directly to the new store.

On September 25, 1993, PolyGram delivered the merchandise to Churchill Truck Lines, Inc. ("Churchill"). Churchill issued PolyGram a non-negotiable straight bill of lading.[3] On or about September 27, 1993, Churchill delivered the merchandise to Transus for the purpose of completing the delivery to the new store. Roy Daniel Carver ("Carver") was the Transus delivery driver responsible for delivering the merchandise to the new store. A Pharmor drug store had previously operated in the location of the new store. This delivery marked Carver's first delivery to this location since the Pharmor drug store had ceased its operations there.

Carver knew from the delivery receipt that he was delivering store merchandise rather than construction materials. Carver recalled that the former Pharmor delivery ramp and roll-up door on the north side of the building had been closed and that another loading dock had been built at the south side of the building. Carver did not notice any other trucks making deliveries and did not recall any construction workers or other people

3. The bill of lading is attached to the Complaint as Exhibit A.

walking around outside of the new store.[4] When Carver arrived at the new store on October 1, 1993, the new store was under some construction. Carver did not actually enter the inside of the new store; rather, he rang the bell at the loading dock and was admitted into the receiving area of the new store.[5] From the receiving area, Carver's ability to see into the inside of the store was limited.[6]

The delivery policy of Transus required that Carver obtain a signature at the delivery site on the delivery receipt and prohibited Carver from delivering goods to someone other than an employee of the consignee. The bill of lading listed the consignee[7] as Media Play # 8119, Newberry Crossing, 1009 N.W. 76th Blvd., Gainesville, Florida 32606, but did not contain similar limitations. Carver remembers speaking to a man at the new store who signed the delivery receipt for the merchandise.[8] He could not, however, recall the name, appearance, or clothes of the man, and did not know whether the man was a Media Play employee. Carver, however, did testify that he was confident making the delivery to the person signing the bill.[9] The evidence in the record reveals that the man who signed for the merchandise was Dick Jones, a member of the construction crew who Media Play had hired but who was neither an employee of Media Play nor authorized to receive shipments on Media Play's behalf. According to the delivery receipt, the merchandise delivered was one shrink-wrapped pallet with sixty-seven cartons of sound recordings.[10]

Jeffrey Lee, the General Manager of Media Play Store No. 8119, subsequently arrived at the new store to check on construction progress and to interview potential new employees. At the time Lee arrived, the construction crew was still in the process of demolishing walls and fixtures, and office walls had not been constructed.[11] After Jones alerted Lee to the merchandise, Lee found approximately thirty (30) cartons of the original shipment of the merchandise inside the new store amidst construction supplies and building materials. Aside from the merchandise at issue, Media Play did not begin to receive merchandise for sale until November 1, 1993, based in part upon the fact that Media Play did not have a place to store or use merchandise on-site until that time. Lee stored these sound recordings for approximately two weeks in his apartment.

PolyGram gave Media Play a credit for its loss of the merchandise, which was valued at $38,356.44. PolyGram then submitted a loss of claim to Transus for reimbursement for the loss of the merchandise. Transus denied the claim about a week later on the basis that the merchandise had been delivered. On June 20, 1994, PolyGram inquired as to who had signed the delivery receipt, and Transus subsequently denied PolyGram's claims on the alternate grounds that PolyGram had waited too long to present the claim. On September 19, 1994, however, PolyGram provided Transus with a copy of the Interstate Commerce Act, which prohibits carriers from requiring notice of claim to be filed within less than nine (9) months. Ten days later, without contacting the driver who made the delivery, Transus denied the claim based upon "the merits of the claim."

---

**4.** Carver's poor recollection is easily explained with reference to the numerous deliveries that Carver made in the Gainesville area during his tenure with Transus. For example, Carver has testified that in October 1993, he probably made between fifteen and thirty deliveries per day working five days per week. Carver Dep. at 40.

**5.** Carver Dep. at 49.

**6.** *Id.* at 54.

**7.** A "consignee" is the "person named in a bill of lading as the person to whom the goods are to be delivered." 49 U.S.C. § 80101(1).

**8.** This man also had to give Carver access to the building after Carver rang the bell at the loading dock. *See* Carver Dep. at 54.

**9.** Carver Dep. at 92.

**10.** *See* Plaintiff's Ex. 4 to Carver's Dep.; Carver Dep. at 62, 69.

**11.** The photographs attached to his deposition as Exhibits A3 and A4 fairly and accurately depict the premises upon his arrival.

Both parties have moved for summary judgment on the basis of these undisputed facts. PolyGram asserts that Transus is liable under both statutes due to its failure to make a proper delivery at the new store to an agent of Media Play, the consignee. Transus, on the other hand, asserts that it exercised reasonable diligence in making delivery to the new store that PolyGram had specified in the bill of lading and that Media Play not only received part of the shipment but also may have actually sold a part of the merchandise at retail. Further, Transus argues that, even if there was misdelivery, a common carrier is not liable for misdelivery or damage to goods under either statute to the extent that the loss was caused by the shipper's negligence. Transus relies upon the fact that PolyGram was supposed to ship the merchandise to Media Play's distribution center in Minneapolis, rather than to Media Play Store No. 8119 in Gainesville, Florida. In addition, Transus contends that the Interstate Commerce Act preempts PolyGram's claim for attorneys' fees under state law and pre-judgment interest.

## II. DISCUSSION

■ Liability under both statutes under which PolyGram seeks recovery[12] ceases upon delivery of the goods to the proper person. *See Electro Source, Inc. v. United Parcel Service, Inc.,* 95 F.3d 837, 839 n. 5 (9th Cir.1996); *Intech, Inc. v. Consolidated Freightways, Inc.,* 836 F.2d 672, 674 (1st Cir.1987); *Republic Carloading & Distributing Co. v. Missouri Pac. R. Co.,* 302 F.2d 381, 386 (8th Cir.1962). Accordingly, the parties have argued whether Transus delivered the merchandise to the consignee in accordance with the bill of lading so as to avoid liability. According to PolyGram, Transus failed to deliver the merchandise to an agent of Media Play as the bill of lading required so that Transus is liable for the actual loss incurred by PolyGram. Transus asserts that it is not liable based upon its completed delivery to the location specified on the bill of lading. In the alternative, Transus asserts that any damage due to misdelivery was a result of PolyGram's negligence in shipping the goods to Florida rather than Minnesota. Because the court finds that there was no misdelivery on the part of Transus, it is unnecessary to reach the question of PolyGram's negligence.

As this action involves questions of federal law, the court finds *Intech, Inc. v. Consolidated Freightways, Inc.,* 836 F.2d 672 (1st Cir.1987), to be most instructive for determining what constitutes "delivery" for the case at bar. In *Intech,* the common carrier had issued a Uniform Straight Bill of Lading to transport saw-cutting machinery in two separate containers from California to a final destination in Massachusetts. *Id.* at 673. When the first container arrived at the destination, i.e., was "spotted," the driver for the common carrier refused to unload it until the second container arrived. *Id.* The consignee in turn refused to accept the first container until it was unloaded from the trailer. *Id.* The second container never arrived. After the common carrier had returned the first container to its terminal, and almost ten months after the initial delivery attempt, the consignee inspected the container at the common carrier's premises, discovered damage, and made a written claim for damages. *Id.* Liability for damage to the first container, therefore, hinged upon an initial determina-

---

**12.** The Carmack Amendment provides for the liability of a "common carrier" to the person entitled to recover under receipt or bill of lading for loss or injury to goods incurred during transportation. See 49 U.S.C.A. § 11707 (1997). The Carmack Act codified the common law rule that a carrier was liable for goods transported unless the damage was caused by an act of God, public enemy, act of the shipper himself, public authority or the inherent vice or nature of the goods. *See North American Van Lines, Inc. v. Pinkerton Sec. Systems, Inc.,* 89 F.3d 452, 456 (7th Cir. 1996). To establish a *prima facie* case under the Carmack Amendment, the shipper must show: (1) delivery of the goods to the initial carrier in good condition, (2) damage of the goods before delivery to their final destination, and (3) the amount of damages. *See Conair Corp. v. Old Dominion Freight Line, Inc.,* 22 F.3d 529, 531 (3d Cir.1994). The Federal Bills of Lading Act establishes the liability of a common carrier for misdelivery of goods, including delivery to a person not authorized to possess the goods. *See* 49 U.S.C.A. § 80111(a) (1997).

tion of whether the defendant had effectively "delivered" the container to the consignee.

The First Circuit acknowledged that the determination of what constituted "delivery" was governed by the bill of lading or "contract [of carriage]" and the intent of the parties. *Intech,* 836 F.2d at 674. The First Circuit then found in relevant part that:

> [a] 'straight bill of lading,' such as we have here, simply requires delivery of the goods to the consignee. Generally the spotting of a shipment at the consignee's place of business constitutes delivery regardless of whether the consignee has accepted or rejected the goods. . . . [S]potting a shipment is not *final* delivery if 'anything remains to be done by the carrier in order to effectuate a delivery.'

*Id.* at 674 (citation omitted). The court determined, however, based upon a reference within the contract referring to a letter from the carrier quoting a price for unloading, that there was some evidence indicating that the carrier was required to unload the container in order to complete delivery. *Id.* at 675.

■ Therefore, a bill of lading acts as contract between the shipper and the carrier, and its terms and conditions are binding upon those parties. *See EF Operating Corp. v. American Bldgs.,* 993 F.2d 1046, 1050 (3d Cir.) (citation omitted), *cert. denied,* 510 U.S. 868, 114 S.Ct. 193, 126 L.Ed.2d 151 (1993); *see also Interocean Steamship Corp. v. New Orleans Cold Storage and Warehouse Co., Ltd.,* 865 F.2d 699, 703 (5th Cir.1989). Like Intech, the present case also involves a "straight bill of lading." [13] The bill of lading before the court listed the consignee as Media Play # 8119 Newberry Crossing, 1009 N.W. 76th Blvd., Gainesville, FL 32606. Transus' driver has testified that he transported one shrink-wrapped pallet with sixty-seven cartons of sound recordings to that location. A signed delivery receipt indicates that a person, who has subsequently been identified as a general contractor working on the site, acknowledged this shipment. Nothing on the face of the bill of lading indicates that Carver needed to take any further action to complete delivery.

■ To the extent that the delivery policy of Transus required that Carver obtain a signature at the delivery site on the delivery receipt and prohibited Carver from delivering goods to someone other than an employee of the consignee, Carver substantially complied with this policy. Carver obtained the signature of the person who had opened the doors by the loading dock and who had actually allowed him admittance to the consignee's place of business. The driver with many years of experience thereby averred that he was satisfied with the delivery.

The fact that Dick Jones was not authorized to sign for the receipt of merchandise on behalf of Media Play is inconsequential, as is PolyGram's assertion that Carver should have called in advance of delivery because he was making delivery to a construction site. Nothing in the bill of lading or otherwise in the record evidences an agreement between PolyGram and Transus to have an actual *employee* of Media Play sign for the merchandise or that Carver was required to perform any other duty.[14]

■ Accordingly, under *Intech,* a common carrier can effect "delivery" by merely depositing the merchandise at the consignee's place of business without acceptance or rejection by the consignee. *See Intech,* 836 F.2d at 674; *see, e.g., Interocean,* 865 F.2d at 703 (carrier's liability terminated under bills of lading after containers reached destination and arrived at warehouse); *Caporicci Footwear, Ltd. v. Roadway Package Systems, Inc.,* 894 F.Supp. 265 (E.D.Va.1995) (common

---

13. *See* Plaintiff's Exhibit 2 to Carver's Dep.

14. The court finds PolyGram's reliance upon the fact that Transus had a custom and practice of calling ahead to construction sites is misplaced. The bills of lading put Transus on notice only of the fact that Carver would be delivering merchandise to a retail store at a location where a different retail store used to exist. In addition, Carver testified that Transus frequently delivered inventory to stores prior to the official opening of the stores.

**1460**

carrier who delivered goods to proper location identified in papers and who left goods in storage bay as instructed with person falsely identifying himself as representative of consignee despite observation of representative loading U–Haul truck discharged contractual obligation and was not negligent). Because Transus did this, and PolyGram has not shown that the goods were in diminished condition at the time of said delivery, the allocation of risk of loss shifted to PolyGram. Moreover, liability extinguished under both the Carmack Act and the Federal Bills of Lading Act.

■ Even were summary judgment inappropriate on the issue of liability under these Acts, however, the court also finds that attorneys' fees and costs pursuant to O.C.G.A. § 13–6–11 are not recoverable under the Carmack Amendment. *See Rini v. United Van Lines, Inc.*, 104 F.3d 502, 506 (1st Cir. 1997) (holding that Carmark Act preempted state law claims, including those for liability for payment of claims), *petition for cert. filed*, — U.S. ——, 118 S.Ct. 51, 139 L.Ed.2d 16 (1997) (No. 96–1800); *Accura Systems, Inc. v. Watkins Motor Lines, Inc.*, 98 F.3d 874, 877 (5th Cir.1996) (citation omitted); *Strickland Transp. Co. v. American Distributing Co.*, 198 F.2d 546, 547 (5th Cir. 1952). Although PolyGram has pointed to authority from other circuits which finds to the contrary, *see Caspe v. Aaacon Auto Transport, Inc.*, 658 F.2d 613 (8th Cir.1981), the Eleventh Circuit adopted as binding precedent all decisions that the former Fifth Circuit rendered prior to October 1, 1981. *See Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc). In the absence of clear Eleventh Circuit authority to the contrary, the former Fifth Circuit's ruling in *Strickland Transp. Co. v. American Distributing Co.*, 198 F.2d 546, 547 (5th Cir. 1952), is binding upon this court. Accordingly, PolyGram may not recover the attorneys' fees and costs sought under Georgia law because they are preempted by the Carmack Amendment.

■ The court also notes its concern with the fact that PolyGram's motion requests

judgment in the entire amount of the credit that was given to Media Play, or $38,256.44, in light of the record developed before the court. The admission during deposition by the manager of Media Play Store No. 8119 that he had recovered at least thirty cartons of the merchandise appears to create a material issue of fact in regard to the amount of damages that PolyGram actually suffered. As indicated *infra*, the actual amount of damages is one element of PolyGram's *prima facie* case under the Carmack Amendment. *See Conair Corp.*, 22 F.3d at 531. For this additional reason, Plaintiff is not entitled to summary judgment on this claim.

## III. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED [14–1], and Plaintiff's motion for summary judgment is DENIED [16–1].